## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MARY MORGAN<br>5429 Parker Street<br>Richmond, VA 23231, | ) |
| AMANDA SMITH<br>13650 Little Patrick Road<br>Amelia Court House, VA 23002, | ) |
| SADE BATTLE<br>2029 Broad Walk Boulevard<br>Richmond, VA 23224, | ) |
| LA-DEVA DABNEY<br>10261 Lakeridge Square Court, Apt. G<br>Ashland, VA 23005, | ) |
| KYRA FRANKLIN<br>6703 Mason Dale Place<br>Richmond, VA 23234, | ) No. 1:11-cv-01066-GK |
| ASHLEY THOMAS<br>6521 Octagon Drive, Apt. 4B<br>Richmond VA 23234 | ) FIRST AMENDED CLASS ACTION<br>) COMPLAINT |
| and | ) |
| LORETTA TOWNS<br>3136 Cullenwood Drive<br>Richmond, VA 23234 | ) |
| on behalf of themselves and all others similarly situated, | ) |
| Plaintiffs, | ) |
| v. | ) |
| RICHMOND SCHOOL OF HEALTH AND<br>TECHNOLOGY, INC.,<br>9325-C Midlothian Turnpike<br>Richmond, VA 23236 | ) |
| Defendant. | ) |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

PARTIES ...................................................................................................................13

JURISDICTION AND VENUE .................................................................................15

FACTUAL BACKGROUND .....................................................................................15

    1.  FOR-PROFIT COLLEGES HAVE GROWN DRAMATICALLY,
        RELY HEAVILY ON FEDERAL FINANCIAL AID, AND POSE A
        SIGNIFICANT PROBLEM OF FRAUD AND ABUSE ...........................................15

    2.  RSHT ......................................................................................................19

        A.      RSHT's Programs and High Tuition .....................................19

        B.      RSHT and Federal Financial Aid..........................................20

        C.      RSHT Fails to Fulfill Its Promise and Obligation to
                  Provide an Adequate Education and Prepare Its Students
                  for Employment in Their Field of Study.................................23

    3.  EXPERIENCES OF THE NAMED PLAINTIFFS AT RSHT...................................31

        A.      Plaintiff Mary Morgan ..................................................... 31

        B.      Plaintiff Amanda Smith ........................................................36

        C.      Plaintiff Sade Battle .............................................................42

        D.      Plaintiff La-Deva Dabney......................................................46

        E.      Plaintiff Kyra Franklin..........................................................50

        F.      Plaintiff Ashley Thomas ........................................................55

        G.      Plaintiff Loretta Towns .........................................................60

    4.  DEFENDANT ENGAGES IN "REVERSE REDLINING" BY
        TARGETING AFRICAN AMERICANS AND RESIDENTS OF
        LOW-INCOME NEIGHBORHOODS FOR ENROLLMENT AT RSHT ................67

CLASS ALLEGATIONS ..........................................................................................69

i

INJURY TO NAMED PLAINTIFFS ............................................................................................72

CAUSES OF ACTION ..............................................................................................................73

PRAYER FOR RELIEF .............................................................................................................76

DEMAND FOR JURY TRIAL ...................................................................................................77

## FIRST AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.      Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns bring this action for damages, injunctive relief, and declaratory relief on behalf of themselves and all others similarly-situated against Defendant Richmond School of Health and Technology, Inc. to seek redress for violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; breach of contract; and fraudulent inducement to contract.  Plaintiffs have been and continue to be injured by a deceptive and dishonest scheme perpetrated by Defendant in the area of post-high school vocational education.

2.      Plaintiffs are or have been enrolled in a for-profit college called "RSHT" that Defendant has owned and operated since 1997.  (Defendant and its college are referred to interchangeably herein as "RSHT".)  The college has also been known as the "Richmond School of Health and Technology" and the "RSHT Training Center."  RSHT offers vocational degrees and diplomas for occupations such as surgical technician, medical assistant, pharmacy technician, and more at its two campuses in Richmond and Chester, Virginia.  RSHT explicitly states in its "School Catalog" that its "primary purpose . . . is to instruct students to such competency levels that they are qualified for employment and/or advancement in existing or potential occupational fields."  RSHT makes numerous other specific representations to potential students that the education the school provides is adequate and sufficient to allow the students to practice and succeed in their field of study.

3.      RSHT is a sham.  It exists to make money without any regard for the education its students receive in exchange.  The school provides little if any educational value and fails to enhance the occupational qualifications and career prospects of its students.  Among other failings, RSHT does not prepare its students for certification tests that they must pass to be certified and/or licensed in their field; does not provide adequate externships to students who require externships for certification and/or licensing; does not provide adequate equipment to train students properly; and does not always provide teachers for its classes.

4.      RSHT nonetheless charges each student from $10,000 to $20,000 or even more, depending on the program.  RSHT finances its scheme by enrolling almost exclusively students who receive federal financial aid, mostly in the form of student loans from the federal government.  This aid totals more than $5 million a year, which is over 86% of RSHT's revenue.  RSHT plays an extensive role in the financial aid process, including filling out most or all students' federal financial aid forms and gathering and submitting the students' necessary paperwork to the United States Department of Education ("Department of Education").  RSHT works to maximize the aid each student receives from the Department of Education because that is how the school maximizes the number of students who can pay its high tuition.  RSHT treats the Department of Education as its cash source, with the students serving unwittingly as the means by which RSHT enriches itself at the expense of both the students and the public fisc.

5.      Most students leave RSHT saddled with large debts as a direct result of RSHT's scheme to generate revenue through federal financial aid programs.  Yet they also leave without the prerequisites and knowledge to obtain certification, an occupational license from Virginia, and/or a job in their field of study, even though that it is what RSHT contracts to give them in return for their tuition.  The students therefore also leave RSHT without any increased earning

2

capacity or the ability to manage the large debts they incur because of RSHT.  This often leads to students defaulting on their student loans, which prevents them from qualifying for other student loans to attend legitimate educational institutions in the future, destroys their credit ratings, and impairs their ability to get credit and to pass workplace background checks for years into the future.  RSHT does well in earning money off its students, but it earns an "F" in serving their educational interests because it is concerned only with profit, not education.

6.      Defendant is engaged in a pattern or practice of specifically and intentionally targeting this unlawful scheme at African Americans by focusing RSHT's marketing and outreach at channels that disproportionately reach an African-American audience.  This includes, but is not limited to, advertising on the BET (Black Entertainment Television) television channel; advertising on other television channels during shows that have a disproportionately high African-American viewership but not during other shows; and advertising on Richmond hip-hop radio stations 92.1 FM and 106.5 FM.  RSHT's advertising emphasizes that RSHT is located "on the bus line."  This is a euphemism that RSHT uses intentionally to portray itself as a school for African Americans and to target African-American communities that rely disproportionately on Richmond's public transportation system.  Six of the named Plaintiffs are African-American.

7.      RSHT similarly targets residents of low-income neighborhoods in the Richmond area.

8.      As a direct result of RSHT's pattern or practice of deliberately targeting its programs on the basis of race and at low-income neighborhoods, RSHT's student body is disproportionately African-American.  African Americans constitute 75% of all RSHT students, even though the Richmond metropolitan area is only 30.1% African-American.  A comparable

disparity remains even after limiting the population to people over 25 years old with a high school diploma or GED certificate but no subsequent degree (*i.e.*, people more likely to be interested in for-profit vocational colleges).  Only 33.8% of this population in the Richmond metropolitan area is African-American.

9.      Targeting African Americans to take out loans on the basis of deceptive and otherwise unfair practices constitutes "reverse redlining."  Reverse redlining has repeatedly been held to violate federal anti-discrimination laws, including the Equal Credit Opportunity Act.  The disparate impact of RSHT's pattern or practice of targeting poorer neighborhoods likewise violates the Equal Credit Opportunity Act.

10.      Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns all enrolled at RSHT on the basis of RSHT's material misrepresentations about the quality and occupational benefits of the education provided by RSHT.  Each took out thousands of dollars in federal student loans to pay for tuition at RSHT, but none received a remotely adequate education in return.  The Plaintiffs' experiences at RSHT are typical of the many students who have attended RSHT.

11.      In addition to detailed allegations set forth below regarding the experiences of the named Plaintiffs at RSHT, declarations from forty additional former and current RSHT students are attached to and incorporated herein.  These declarations corroborate Plaintiffs' allegations and further demonstrate RSHT's consistent pattern or practice of unlawful activity.  *See* Exs. 1-40.

12.      Plaintiff Mary Morgan is African-American and paid over $10,000 to attend RSHT's Community Home Health ("CHH") program at the Richmond campus from January 2010 to October 2010.  Morgan paid for most of this cost with federal student loans and smaller

4

Pell Grants, all arranged for her by RSHT.  RSHT represented to Morgan that, among other things, attending RSHT would give her an education that would make her eligible for a license in community home health and that this credential would be "higher" than the Certified Nurse Aide ("CNA") license Morgan had previously held.[1]  No such certification or license in community home health exists in Virginia, however.  Morgan enrolled at RSHT on the basis of RSHT's representations about the CHH program.

13.     The curriculum that RSHT used for Morgan's program did not prepare her for any certification examination.  In addition, among other deficiencies, the school did not even provide proper and sufficient books and laboratory materials for the students to work with, such as hospital beds and patient dummies.

14.     The CHH program was so inadequate that, shortly after Morgan graduated, RSHT agreed to pay for Morgan and the other CHH students to attend a six-week Certified Nurse Aide Training Program at a different for-profit school in Richmond.  The other school's course cost approximately $900 and was meant to prepare students to take the CNA examination.

15.     Morgan attended the other school's class and took and passed the CNA exam.  This left Morgan with the same credential she previously held after spending over $10,000 and nine months on an education that RSHT promised would give her a higher and more valuable credential then she held before.  For more than $10,000, the only purported benefit Morgan received in the end was a six-week refresher course from another school valued at $900.

16.     Plaintiff Amanda Smith, who is white, learned about RSHT's Surgical Technology program from an African-American co-worker.  Smith was living in a predominantly African-American part of Richmond at the time.  She started the program at the Richmond campus in August 2008 and graduated in March 2010.  Smith received $20,000 in

---

[1]     Certified Nurse Aides are also frequently referred to as "Certified Nursing Assistants."

federal financial aid arranged by RSHT, all in the form of student loans, to pay RSHT's tuition. Smith enrolled in the program because RSHT promised her that the education would give her all of the knowledge and prerequisites she needed to become a licensed surgical technician. The licensing requirements include passing a written certification examination and a specified amount of surgical experience, which RSHT students are supposed to get through externships arranged by RSHT.

17.     The education Smith received at RSHT was not remotely sufficient to prepare her for the written exam. She was only able to pass through self-study unassisted by the school and with tutoring from her fiancé, who is a surgical nurse.

18.     Nor did RSHT arrange adequate externships for Smith. She was instead given three externships that did not include any surgical experience. At one point, Smith even arranged on her own for an appropriate externship with a surgical center, but RSHT needed to call the center to formalize the externship and refused to do so. Because she lacks the required surgical experience, Smith cannot become certified as a surgical technician.

19.     Smith has tried to get a surgical externship on her own since graduating, but hospitals and surgical centers will not give her one because of liability concerns since she is no longer attending an educational institution. Smith has applied for many jobs as a surgical technician but cannot secure one because she is not certified.

20.     Plaintiff Sade Battle is African-American and paid over $10,000 to attend RSHT's Community Home Health program at the Richmond campus beginning in March 2010. Battle paid for most of this cost with federal student loans and smaller Pell Grants, all arranged for her by RSHT.

21.     As with Plaintiff Mary Morgan, RSHT represented to Battle that attending RSHT would give her an education that would make her eligible for the "community home health" credential and that this credential would be higher than a CNA license.  RSHT's admissions officer, Deborah Alexander, also told Battle that she would be employed and earning at least $18 an hour within three months of graduating, and that RSHT would give her extensive help to find such a job.  Alexander also represented, among other things, that RSHT would arrange and facilitate a valuable externship for Battle that would take into account Battle's particular childcare and transportation concerns, which Battle had described to Alexander.

22.     Battle enrolled at RSHT on the basis of RSHT's representations about the CHH program.  After enrolling, she found that the CHH program was educationally inadequate in many respects and that Alexander's representations were not true.

23.     When Battle learned that there is no such thing as a certification in community home health and that RSHT did not know what examination the CHH students would sit for, Battle decided to withdraw from RSHT and wait until RSHT resolved this basic problem.  Battle returned to RSHT several months later after RSHT said it was arranging for the CHH students to take the CNA course at a different school.

24.     After Battle returned, however, she still had to take some classes and do her externship before RSHT would send her to the other school.  Contrary to its promises, RSHT refused to accommodate Battle's childcare and transportation requirements so that she could complete the externship.  Battle was left with a choice between losing her job and completing the RSHT program.  This was not a real choice because Battle needed to keep her job to support her family, and she therefore left the program.

25.     Battle now earns $11 an hour working with mentally ill patients in a job that she got without any assistance from RSHT.  Battle's employer needed to train her in tasks that Battle was supposed to learn at RSHT but did not because the CHH program was so poor.

26.     Plaintiff La-Deva Dabney is African-American and paid over $20,000 to attend RSHT's Medical Billing and Coding program at the Chester campus from May 2006 to October 2007.  Dabney paid for most of this cost with federal student loans, all arranged for her by RSHT.

27.     RSHT represented to Dabney that, among other things, she would be able to get a job earning $36,000 to $38,000 annually by successfully completing the program; that the school would help her get such a job; and that the school would arrange an externship in which she would gain valuable hands-on billing and coding experience in a medical office or other health care facility.

28.     Most of Dabney's classes were very poor and the curriculum did not prepare her for the medical billing and coding certification exam.  RSHT also failed to arrange an externship. Instead, RSHT told Dabney to sit in the school library for five weeks and do practice exercises. The school termed this an externship.

29.     Dabney passed the certification exam by a slim margin, but only because she studied extensively on her own, including many subject areas that were not part of her coursework.  Still, she was not able to obtain a job in medical billing and coding.  Despite Dabney's frequent requests, RSHT provided very little job placement assistance and Dabney now works in an unrelated field.  She is taking classes toward her bachelor's degree at a different institution because her education at RSHT did not enhance her occupational opportunities.

30.     Plaintiff Kyra Franklin was enrolled in the Surgical Technology program at RSHT's Chester campus from November 2007 to July 2009.  Franklin is African-American.

31.     Franklin signed up for the program based on RSHT's promises that, among other things, Franklin would be guaranteed a job upon graduation and her starting salary in the field would be $50,000 to $60,000 per year.  RSHT told Franklin that RSHT was fully accredited, and that the credits she earned at RSHT would transfer to other educational institutions.

32.     RSHT arranged approximately $15,000 in federal student loans for Franklin, who also took out over $6,000 in loans from Sallie Mae to cover the rest of her tuition.  The education Franklin received did not live up to the promises RSHT made, however.  Among other things, the school failed to provide teachers for classes and sufficient instruments and other materials for hands-on training.

33.     Moreover, RSHT told Franklin and other surgical technology students that they would be eligible to sit for the preferred certification exam – given by the National Board of Surgical Technology and Surgical Assisting ("NBSTSA") – but they were not eligible for that exam because RSHT never obtained the necessary accreditation.  Upon graduation, Franklin was only eligible for certification from the National Center for Competency Testing ("NCCT"), a certification that employers in the Richmond area generally do not recognize.  In addition, RSHT did not adequately prepare Franklin to take and pass the NCCT certification exam.  As a result, Franklin is not certified by any organization.

34.     RSHT also failed to provide Franklin with externship opportunities that would allow her to obtain the 150 surgical procedures needed for certification.  Although Franklin had two externships in the operating room, which is more than many of her fellow Surgical Technology students at RSHT, the externships allowed her to complete only approximately one-

9

third of the required procedures.  Thus, even if Franklin had taken and passed the written exam, she would still be ineligible for certification as a surgical technician.

35.     Although she graduated near the top of her class at RSHT, Franklin has not been able to find work as a surgical technician, much less a position that pays over $50,000 a year. Franklin has also learned that, despite RSHT's promises, other schools will not allow her to transfer the credits she earned at RSHT.

36.     Plaintiff Ashley Thomas was a student in RSHT's Pharmacy Technician program at the Chester campus from March 2009 to January 2010.  Thomas, who is African-American, learned about RSHT from a relative and then went in to the campus to speak with an RSHT representative about whether and how the program could benefit her.

37.     Among other promises, RSHT told Thomas that the school had a high success rate, with the vast majority of students graduating and finding jobs in their field of study due to RSHT's extensive job placement services.  RSHT told her she would earn $60,000 when she graduated from the Pharmacy Technician program.

38.     RSHT led Thomas to believe that her entire education would be funded by federal student aid in the form of grants that she would not have to repay.  RSHT prepared her financial aid paperwork and had Thomas sign the forms.  More than a month into the program, Thomas first learned that RSHT had applied for student loans on her behalf instead of just grants.  RSHT arranged for Thomas to borrow approximately $4,000 in federal student loans to pay for RSHT's tuition.

39.     Thomas' education in the Pharmacy Technician program was extremely deficient in many respects.  Among other things, she was promised one-on-one instruction in classes with

10

a small number of students, yet her classes had as many as thirty students and sometimes did not even have an instructor or an instructor with a background in the subject being taught.

40.     Upon graduating, Thomas was nonetheless able to find a job at a local pharmacy in April 2010.  She found the job without any assistance from RSHT.  But because her education at RSHT had not prepared her for the licensing examination and she therefore was not licensed, Thomas was only eligible to stay in this position for a short time and was laid off in September 2010.  Since then Thomas has looked for another job as a pharmacy technician without success. RSHT still has not provided any job placement assistance to Thomas.

41.     Thomas took the Virginia state exam for pharmacy technicians in May 2011 in an effort to obtain her license.  Because she knew that her classes at RSHT had not covered much of the material tested on the exam, Thomas studied extensively in an effort to learn the additional material on her own.  She did not pass the exam, however, and remains unemployed.

42.     Plaintiff Loretta Towns, who is African-American, attended the Surgical Technology program at RSHT's Richmond campus from June 2009 to December 2010.  Towns learned about RSHT from advertisements on BET and local hip-hop and rap radio stations. Towns paid more than $20,000 for the program, including over $16,000 obtained through federal student loans.

43.     RSHT induced Towns to attend by promising, among other things, that it would be easy for Towns to find a job paying $16-$18 per hour at the end of the program and that RSHT would provide extensive job placement assistance.  RSHT also promised Towns that the credits she earned at RSHT would transfer to other educational institutions if she wanted to continue her education.

44.      As with Plaintiff Amanda Smith, none of the externships that RSHT arranged for Towns included any surgical experience.  Towns is therefore not eligible for certification as a surgical technician.

45.      Even if she had the requisite surgical experience, the education Towns received at RSHT was not adequate to prepare her for the certification examination.  Among other deficiencies, RSHT did not have sufficient instruments and other supplies for learning; assigned instructors that made no attempt to engage in any teaching; and reassigned instructors so frequently that learning was exceedingly difficult.

46.      Towns has not been able to find a surgical technician job since graduation and RSHT has provided little or no job placement assistance.  She continues to hold the same job that she started approximately six months after enrolling at RSHT.  The job is in a medical field that is unrelated to surgical technology and Towns found it without any help from RSHT.

47.      Towns wants to go back to school because her education did not improve her occupational opportunities.  She has not found any area schools that will apply her credits from RSHT toward a bachelor's degree, however.

48.      As a direct result of RSHT's deceptive and unlawful practices, Morgan, Smith, Battle, Dabney, Franklin, Thomas, and Towns now have significant student loans and lack the resources to repay them.  They have not benefitted occupationally by attending RSHT and lack any real prospects of obtaining the kinds of jobs that RSHT told them they would be eligible for if they attended RSHT.  RSHT has acted unlawfully by exploiting Plaintiffs, and many other students, to enrich itself with taxpayer-funded federal financial aid dollars while providing virtually nothing in return.

49.     In addition to the allegations set forth above and below describing in detail the experiences of the seven named plaintiffs at RSHT, this First Amended Complaint attaches and incorporates signed declarations from forty additional current and former RSHT students.  The experiences of these declarants, like those of the named Plaintiffs, are representative of the experiences of the thousands of students who have enrolled at RSHT and who are members of the class for which Plaintiffs seek certification.

50.     The declarants describe the myriad misrepresentations made to them personally by RSHT and the many ways in which RSHT failed to provide them with an adequate education or to enhance their opportunities to obtain good jobs that pay well in their fields of study.  These forty students represent both of RSHT's campuses and RSHT's programs in Community Home Health, Licensed Practical Nursing, Massage Therapy, Medical Assistant, Medical Billing and Coding, Pharmacy Technician, and Surgical Technology.  All borrowed extensively from the federal government to finance their enrollment at RSHT and have gained little if anything of value in return.  These forty representative declarations provide an extraordinary amount of detailed evidence supporting the allegations set forth herein.  The declarations demonstrate the consistent, methodical, intentional, and discriminatory practices utilized by RSHT to perpetrate its unlawful scheme.

## PARTIES

51.     Plaintiff Mary Morgan was a student in the Community Home Health program at RSHT's Richmond campus from January 2010 to October 2010.  Morgan is a resident of Richmond, Virginia, and has been at all times relevant to the allegations set forth herein.  Morgan is African-American and 49 years old.

13

52.     Plaintiff Amanda Smith was a student in the Surgical Technology program at RSHT's Richmond campus from August 2008 to March 2010.  Smith was a resident of an area of Richmond, Virginia, that is predominantly African-American when she enrolled at and attended RSHT.  She is now a resident of Amelia Court House, Virginia.  Smith is white and 28 years old.

53.     Plaintiff Sade Battle was a student in the Community Home Health program at RSHT's Richmond campus from March 2010 to 2011.  Battle is a resident of Richmond, Virginia, and has been at all times relevant to the allegations set forth herein.  Battle is African-American and 24 years old.

54.     Plaintiff La-Deva Dabney was a student in the Medical Billing and Coding program at RSHT's Chester campus from May 2006 to October 2007.  Dabney was a resident of Petersburg, Virginia when she enrolled at and attended RSHT.  Dabney is now a resident of Ashland, Virginia.  Dabney is African-American and 47 years old.  Dabney attended RSHT under her maiden name, La-Deva Wooden.

55.     Plaintiff Kyra Franklin was a student in the Surgical Technology program at RSHT's Chester campus from November 2007 to July 2009.  Franklin is a resident of Chesterfield, Virginia, and has been at all times relevant to the allegations set forth herein.  Franklin is African-American and 39 years old.

56.     Plaintiff Ashley Thomas was a student in the Pharmacy Technician program at RSHT's Chester campus from March 2009 to January 2010.  Thomas was a resident of Colonial Heights, Virginia when she enrolled in and attended RSHT.  Thomas recently moved to Richmond, Virginia.  Thomas is African-American and 23 years old.

57.     Plaintiff Loretta Towns was a student in the Surgical Technology program at RSHT's Richmond campus from June 2008 to December 2010.  Towns was enrolled at RSHT under the last name McInnis-Dortch.  Towns is a resident of Richmond, Virginia, and has been at all times relevant to the allegations set forth herein.  Towns is African-American and 44 years old.

58.     Defendant Richmond School of Health and Technology, Inc. is a Virginia corporation that was formed in 1997.  Richmond School of Health and Technology, Inc. has owned and operated RSHT since 1997, including under the names "Richmond School of Health and Technology" and "RSHT Training Center."  Richmond School of Health and Technology, Inc. maintains two RSHT campuses, which are located in Virginia at 1601 Willow Lawn Drive in Richmond and at 751 West Hundred Road in Chester.  Richmond School of Health and Technology, Inc. maintains a corporate office at 9325-C Midlothian Turnpike in Richmond.  Richmond School of Health and Technology, Inc. is deemed to reside in Washington, D.C. under 28 U.S.C. § 1391(c).

## JURISDICTION AND VENUE

59.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1691e(f), 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

60.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2).

## FACTUAL BACKGROUND

**1.     FOR-PROFIT SCHOOLS HAVE GROWN DRAMATICALLY, RELY HEAVILY ON FEDERAL FINANCIAL AID, AND POSE A SIGNIFICANT PROBLEM OF FRAUD AND ABUSE**

61.     RSHT is one of approximately 2000 for-profit colleges in the country where students who attend are eligible to receive federal financial aid through the United States

Department of Education under Title IV of the Higher Education Act of 1965.  These schools, also known as "proprietary institutions of higher education," are required by federal law to "prepare students for gainful employment in a recognized occupation."  34 C.F.R. § 600.5; *see id.* § 668.8(d)(1)(iii).

62.     For-profit colleges offer a wide array of programs.  Many offer diplomas and associate's degrees in vocational areas like medical billing, cosmetology, massage therapy, web page design, and numerous other areas.  Programs frequently require enrollment for one to two years.

63.     In recent years the number of students attending for-profit colleges has been increasing faster than the number in traditional public and non-profit colleges and universities.  For-profit colleges now enroll approximately 12% of the nation's higher education students.  Students at for-profit colleges are disproportionately older and drawn from lower income backgrounds than students at traditional public and non-profit colleges and universities.

64.     Federal financial aid programs under Title IV have been a critical component of the rapid growth of for-profit colleges.  Title IV programs include, among others, the Direct Loan Program, Stafford Loans, and the Pell Grant Program.  Federal financial aid to for-profit colleges under these programs totaled approximately $24 billion in the 2008/2009 academic year (July 1, 2008 to June 30, 2009).  Approximately 80% of this was in the form of loans and 20% in the form of Pell Grants.

65.     Under the federal Title IV loan programs, students receive loans for their education directly from the United States.[2]  The school receives the loan proceeds and typically credits them to the student's account to pay for tuition and other charges.  Students must repay

---

[2]      For some borrowers before June 30, 2010, these loans came from private lenders but were guaranteed and subsidized by the United States under Title IV's Federal Family Education Loan Program.  RSHT students' loans have come directly from the United States since at least the 1999/2000 academic year.

these loans including applicable interest.  Pell Grants are need-based grants to students that do

not have to be repaid.  Most Pell Grants are awarded to students from families with an annual

income below $30,000.  In the 2008/2009 academic year, individual Pell Grants ranged from

$523 to $4,761.  The maximum annual Pell Grant a student may receive is currently $5,550.

66.     For many years there have been concerns about extensive fraud and abuse

committed by for-profit schools that take advantage of federal financial aid programs without

giving students a useful education in return.  As the Congressional Research Service explained:

> During the late 1980s and into the 1990s, the General Accounting Office (GAO),
> Congress, and Office of the Inspector General (IG) at the U.S. Department of
> Education conducted investigations of student aid programs and found evidence
> of extensive fraud and abuse; some of the worst examples of these practices were
> found at proprietary schools. . . . When default rates peaked nationwide in 1990,
> default rates at proprietary schools reached 41% compared with an overall default
> rate of 22%.  Many proprietary schools were failing to provide students with a
> quality education or training in occupations with job openings, focusing instead
> on obtaining federal student aid dollars.  As a result, students left proprietary
> institutions with no new job skills or few prospects of employment in their field of
> study and burdened with substantial loan debt. . . . [P]roprietary institutions that
> were overly dependent on Title IV revenue were considered institutions that were
> not providing a high quality education, and institutions that might be misusing
> federal dollars.

Congressional Research Service, *Institutional Eligibility & the Higher Education Act:*

*Legislative History of the 90/10 Rule and Its Current Status* (updated Jan. 19, 2005), at 3-4,

*available at* http://www.policyarchive.org/handle/10207/bitstreams/1904.pdf.

67.     In 1992 these concerns led Congress to require for-profit colleges to derive a

minimum percentage of their revenue from non-Title IV sources.  The current version of this rule

is commonly referred to as the "90/10 rule" because the schools must derive at least 10% of their

revenue from non-Title IV sources.  *Id.*

68.     The new rule did not make the problem of fraud and abuse at for-profit colleges

go away.  To the contrary, the problem has grown as the number of students and the amount of

federal financial aid going to these schools has grown.  The GAO recently studied a sample of 15

for-profit colleges (identified in part by focusing on schools that barely satisfied the 90/10 rule)

and summarized key findings as follows:

> Undercover tests at 15 for-profit colleges found that 4 colleges encouraged
> fraudulent practices and that all 15 made deceptive or otherwise questionable
> statements to GAO's undercover applicants.  Four undercover applicants were
> encouraged by college personnel to falsify their financial aid forms to qualify for
> federal aid—for example, one admissions representative told an applicant to
> fraudulently remove $250,000 in savings.  Other college representatives
> exaggerated undercover applicants' potential salary after graduation and failed to
> provide clear information about the college's program duration, costs, or
> graduation rate despite federal regulations requiring them to do so. . . .

> Programs at the for-profit colleges GAO tested cost substantially more for
> associate's degrees and certificates than comparable degrees and certificates at
> public colleges nearby.  A student interested in a massage therapy certificate
> costing $14,000 at a for-profit college was told that the program was a good
> value.  However the same certificate from a local community college cost $520.

*For-Profit Colleges – Undercover Testing Finds Colleges Encouraged Fraud and Engaged in*

*Deceptive and Questionable Marketing Practices: Testimony Before the S. Comm. on Health,*

*Educ., Labor, & Pensions* (Aug. 4, 2010) (statement of Gregory D. Kutz, Managing Director

Forensic Audits & Special Investigations), *available at* http://www.gao.gov/new.items/

d10948t.pdf.

69.     Fraud and abuse by for-profit colleges and their frequent failure to provide an

education remotely commensurate with their promises to students and their high tuition bills

remains a subject of great concern in Congress and throughout the country.  Although some of

these schools may provide a useful and fairly-priced educational service, many more are leaving

students with nothing to show from their "education" but debt from federal student loans.  In

promulgating new rules designed to address these problems, the Department of Education

recently reported that for the 2008 academic year, "46 percent of student loans (weighted by

18

dollars) borrowed by students at two-year for-profit institutions are expected to go into default over the life of the loans, compared to 16 percent of loans borrowed by students across all types of institutions."  Program Integrity:  Gainful Employment—Debt Measures, 76 Fed. Reg. 34,386, 34,387 (June 13, 2011).

70.     The consequences of this debt are severe and far reaching.  As the Department of Education explained:

> Former students who are not gainfully employed and cannot afford to repay their loans face very serious challenges.  Discharging Federal student loans in bankruptcy is very rare.  The common consequences of default include large fees—collection costs that can add 25 percent to the outstanding loan balance— and interest charges; struggles to rent or buy a home, buy a car, or get a job; collection agency actions, including lawsuits and garnishment of wages; and the loss of tax refunds and even Social Security benefits.  Moreover, borrowers in default are no longer entitled to any deferments or forbearances and may be ineligible for any additional student aid until they have reestablished a good repayment history.

*Id*.

## 2.     RSHT

### A.     RSHT's Programs and High Tuition

71.     According to data submitted by RSHT to the federal government and published by the Department of Education's National Center for Education Statistics ("NCES"), over 650 students attend RSHT.  Seventy-five percent of the students are African-American and 67% are at least 25 years old.[3]  The student population of each campus (Richmond and Chester) is majority African-American, even though the Chester campus is not in a majority African-American area.

72.     RSHT's website currently states that it offers programs in the following areas:

Practical Nursing
Medical Assistant

---

[3]     NCES data on RSHT is available at http://nces.ed.gov/collegenavigator/?id=437769.

    Surgical Technology
    Pharmacy Technician
    Massage Therapy
    Medical Billing and Coding
    Radiologic Technology

RSHT's website also listed a program in "Community Home Health Care" as of June 22, 2011.

RSHT admissions officers are given quotas for each of the school's programs.  The admissions

officers steer prospective students toward the programs where RSHT is behind on its quota

without regard to the prospective students' interests.

  73.  The NCES data show that RSHT's programs range in cost from $10,140

(Pharmacy Technician) to $28,152 (Radiologic Technology).  They range in duration from 9

months (Pharmacy Technician) to 19 months (Surgical Technology).

  74.  The tuition for RSHT is stated in a written contract that each student and a

representative of the school signs.  This contract is called the "RSHT Enrollment Agreement."  It

commits the student to enrollment in a particular program and to paying the tuition for the entire

program (not just for the first academic term, or "module" as each term is called at RSHT).  The

contract also sets forth how much additional money the student will have to pay if the student

has to repeat a clinical externship.

  **B.**  **RSHT and Federal Financial Aid**

  75.  RSHT is exceptionally dependent on federal financial aid programs.  In the

2008/2009 academic year (the most recent year for which 90/10 data has been published), RSHT

obtained $5,340,486 in revenue from federal Title IV financial aid programs.  This constituted

86.37% of its revenue for the year.  In the 2008/2009 academic year, only 14.3% of the schools

subject to the 90/10 rule nationally derived over 85% of their revenue from federal Title IV

financial aid programs.

76.     The vast majority of RSHT students receive both Pell Grants and student loans from the federal government.  Some students also receive additional aid from federal Veterans benefits and state job retraining programs.

77.     RSHT maintains a financial aid office on each campus.  Through these offices, RSHT – instead of its students – plays the dominant role in arranging for the extension, renewal, and continuation of the federal student loans received by the students.  For example, RSHT completes the federal FAFSA ("Free Application for Federal Student Aid") for virtually all of its students.  The FAFSA is the key form which each student seeking federal financial aid must submit to the federal government.  The students typically go directly to RSHT to apply for their federal student loans and other federal aid.  The students typically do not go directly to the federal government.

78.     RSHT commits fraudulent and dishonest acts in obtaining federal student loans for its students.  It has cut and pasted students' signatures from other documents onto financial aid forms that are submitted to the federal government.  It has altered W-2 forms to misrepresent information regarding students' income and instructed employees to destroy the documents from which the signatures were cut.  It misleads students into believing that they are getting federal grants when they are really getting loans.  After filling out the FAFSA for students, it instructs the students to review only the portion of the form that includes information like their name and address, but not their income and other financial information.  RSHT took advantage of one student who the lacked legal capacity to contract because of a mental disability by having her sign forms taking out federal student loans without her representative present.  This student did not understand that she was borrowing money to pay RSHT.

79.     RSHT frequently interrupts students in the middle of class to sign financial aid forms, thereby preventing the students from having adequate time to review what they are signing.  RSHT does not explain sufficiently the terms of the student loans to its students, even though it is obligated to do so under federal law governing Title IV financial aid.  RSHT instead pushes its students to sign the necessary paperwork as quickly as possible without understanding the significant debts they are taking on.

80.     Upon information and belief, RSHT asserts such a high degree of control over the federal financial aid process and intentionally manipulates the process in inappropriate ways because federal financial aid is essential to its existence.

81.     RSHT communicates with and provides documentation to the Department of Education, including, upon information and belief, the Department of Education's Financial Management Operations office in Washington, D.C., for the specific purpose of gaining pecuniary benefit by obtaining the federal financial aid funds that allow its students to pay RSHT's tuition.  The funds are transferred from the federal government directly to RSHT. RSHT could not maintain its educational scheme and business without its contacts with the Department of Education, including, upon information and belief, the Financial Management Operations office in Washington, D.C.

82.     In addition to the fraudulent and dishonest acts identified above regarding financial aid practices, RSHT commits similarly fraudulent and dishonest acts in additional areas.  RSHT alters unfavorable evaluation forms that students complete about the school and changes students' attendance records and grades.  It requests students' high school transcripts after students graduate instead of before they start classes and forges students' signatures on high school transcript request forms.  It falsifies information about graduates' employment status.

22

Many of RSHT's fraudulent and dishonest acts concerning these types of records are committed in anticipation of regulatory audits and with respect to documents that the school must submit to regulatory authorities.  Upon information and belief, these acts are committed by RSHT for the express purpose of preserving the school's accreditation status.  Without proper accreditation, RSHT would not be eligible to offer federal financial aid to its students.

83.     Money is so much RSHT's single-minded focus that it demands monthly payments on the small portion of tuition that is not covered by financial aid even when a monthly payment has been prepaid.  This monthly payment is commonly in the range of $40.  If a student prepays a month or two, RSHT accepts the extra money but nonetheless requires a new payment each month.  This is a significant financial burden for some students.

C.     **RSHT Fails to Fulfill Its Promise and Obligation to Provide an Adequate Education and Prepare Its Students for Employment in Their Field of Study**

84.     To induce enrollment at RSHT, RSHT tells prospective students, among other things, that the school will provide an appropriate education.  RSHT tells prospective students that the education for which they pay steep tuition will prepare them to pass certification examinations administered by independent organizations and/or to pass state licensing examinations in their field of study.

85.     RSHT also tells prospective students that the school will provide appropriate externships where externships are required for certification and/or licensing.

86.     RSHT also tells prospective students that the credits they earn at RSHT are accepted by and transferable to other institutions of higher education that offer more advanced degrees, such as a bachelor's degree.  This is not true.  Area schools like Virginia Commonwealth University and others do not accept many of the credits awarded by RSHT because RSHT does not satisfy necessary accreditation and/or other objective criteria.

23

87.     RSHT's contractual relationship with its students implicitly obligates it to make a good faith effort to live up to its representations and provide an appropriate education.

88.     RSHT, through employees in its admissions and financial aid offices among others, makes these representations to prospective students to induce them to enroll in RSHT programs.   RSHT's representations to prospective students are knowingly false.

89.     RSHT does not fulfill its promises and obligations to the students who enroll.

90.     One critical way in which RSHT fails to fulfill its promises and obligations is that the school does not prepare students to satisfy certification and licensing requirements.  To practice in some of the fields that RSHT purports to prepare students to enter, individuals must obtain a state license.[4]  In the other fields, students are told that if they graduate from RSHT they will be eligible for certification by an independent body and that certification is an important credential that is valued highly by potential employers.  Obtaining the certification or license requires, among other things, passing a an examination offered by an independent organization not affiliated with RSHT.  RSHT represents to prospective students that it will provide an education that adequately prepares them to pass these examinations.  These representations are knowingly false.

91.     The curriculum utilized by RSHT does not prepare students to pass the examinations required for certification and licensing in their field of study.  The education that students receive at RSHT commonly does not cover major components of the examinations.  Students regularly sit for the examinations and find that the examinations bear little relationship to their course of study at RSHT.  Because the curriculum at RSHT does not prepare them for the mandatory examinations, students are left to try to educate themselves independently.

---

[4]      A license issued by the Virginia Board of Nursing is required to work in Virginia as a licensed practical nurse or a massage therapist.  A license issued by the Virginia Board of Pharmacy is required to work in Virginia as a pharmacy technician.

92.     As a direct result, RSHT students routinely do not pass the examinations or pass only because of their own efforts independent of RSHT.  If RSHT designed its curriculum to prepare students to take the examinations, consistent with its representations to prospective students, the students' passage rate would be much higher.

93.     In addition to passing an examination, a prerequisite for certification or licensing in some of the fields that RSHT purports to prepare students to enter is completion of a specified type of clinical externship.  For example, students in the Surgical Technology program must complete an externship at a hospital or surgical center during which they act in the "scrub" or "circulator" role on a surgical team for 150 surgical procedures.  RSHT represents to prospective students that it arranges for the necessary externships as part of the school's curriculum.

94.     RSHT's representations about externships are knowingly false.  When RSHT makes these representations, it knows both that it does not arrange appropriate externships and that its failure to do so prevents the school's graduates from obtaining jobs in their field of study.

95.     In truth, RSHT arranges very few appropriate externships.  RSHT lacks the necessary relationships with area health care providers like hospitals to arrange the externships for its students.  Upon information and belief, many area health care providers do not want RSHT students as externs because of RSHT's reputation for poorly preparing and educating its students.

96.     Even when externships are arranged, they frequently do not satisfy the mandatory clinical criteria.  For example, Surgical Technology students for whom RSHT arranges externships are frequently placed in a hospital division known as "central sterile" where they merely sterilize and pack instruments.  These students do not obtain the required surgical experience in their externships.

25

97.     Other students have been told to sit in RSHT's library for the whole of their externship.  This is a meaningless exercise and a waste of the students' time.  Upon information and belief, the reason RSHT assigns students to the library for their so-called externships is so that the school can satisfy regulatory requirements by completing attendance sheets showing that the students were at the location to which they were assigned.

98.     RSHT frequently continues to promise its enrolled students who require an externship that the school will obtain one for them prior to the completion of their studies at RSHT.  These promises are knowingly false because RSHT lacks the capacity and intent to obtain adequate externships for its students.  Upon information and belief, these misrepresentations are intended to induce students to remain at RSHT and to continue to seek additional federal student aid to pay RSHT for remaining classes.

99.     In addition to providing valuable hands-on experience, appropriate externships are also important because they give students an opportunity to build connections with potential future employers.  A good externship experience can lead to a student's first job after graduating.

100.    After students complete their studies at RSHT, they have little if any chance of arranging an externship on their own.  Area health care facilities do not want to give externships to former students who are no longer affiliated with a school because of liability concerns.  They also do not want to give externships to former students because of RSHT's poor reputation.  The former students are left with little if any realistic opportunity to satisfy the externship prerequisites for certification or licensing in their fields of study.

101.    Even when students are able to satisfy the certification requirements in the fields of study that do not require a state license, in many cases the certification they receive is of no value because RSHT's accreditations lead to certification from an entity that most Richmond

area employers do not recognize.  Many RSHT students are only eligible to sit for certification

exams offered by the National Center for Competency Testing ("NCCT"), but area employers

generally seek employees certified by a different organization.  RSHT lacks the necessary

accreditation to allows its students to sit for the other organization's examination.  RSHT

deliberately misleads its students about the value of NCCT certification to induce them to enroll

and remain at RSHT.

102.    RSHT students from the Community Home Health program cannot obtain the

credential that RSHT told them the program would lead to for another reason – the credential

does not exist.  RSHT falsely promised prospective students that the CHH program would make

them eligible for a license in community home health, but there is no such thing in Virginia.  Nor

is there a certification from an independent organization in community home health.  RSHT

knew that the credential did not exist when it made this promise to prospective students who later

enrolled in the CHH program.  RSHT also falsely promised prospective students that they would

learn how to start and manage their own home health care business, but the CHH curriculum

included no such information.  RSHT no longer offers the CHH program.

103.    At or around the conclusion of the CHH program – which cost over $10,000 –

RSHT finally admitted to its students that it did not know what certification or license fit the

CHH curriculum.  RSHT eventually paid for the CHH students to enroll in a six-week course to

prepare them for the Certified Nurse Aide examination.  The course cost approximately $900,

and was offered by a different for-profit school.  In the end, all the students gained for more than

$10,000 was a credential that they could have gained for $900.  RSHT did not return any of the

students' tuition dollars.

104.    Another way in which RSHT enriches itself at its students' expense is by failing to provide proper medical tools and equipment for use by students who must be trained to use medical tools and equipment.  Students in the Surgical Technology program have resorted to making photocopies of pictures of surgical instruments and bringing them to class to share with other students in a desperate attempt to gain some semblance of the knowledge that RSHT is obligated to teach them.  Even when teachers have requested basic supplies, RSHT has refused to supply them.  Some students accept externships in central sterile, even though the externship will not satisfy the licensing requirement, because being in central sterile at least gives them an opportunity to handle the surgical instruments that RSHT should provide in the classroom but does not.  Similarly, when RSHT provides books to students, they are frequently out of date and therefore of limited usefulness.

105.    The lack of proper tools, equipment, and supplies prevents RSHT students from learning important and often very basic clinical skills.  When RSHT students begin their externships, their externship supervisors commonly are surprised at how little the students have learned.  Some externship sites have stopped accepting RSHT students as externs or employees because they have found the students to be so poorly prepared by RSHT.

106.    RSHT students also suffer educationally because RSHT often changes their teacher in the middle of an academic term.  RSHT students frequently come to class to find that their teacher has been replaced by a new teacher.  This sometimes happens multiple times in the same class in a module.

107.    In some cases, the old teacher is gone but no replacement teacher has been assigned to the class, and the students are left with no teacher for multiple class sessions. Students have been left for weeks at a time going to classes where there is no teacher.  When this

28

happens, a school administrator comes to the class but does not make any effort to teach the students anything.  The administrator instead tells the students to sign an attendance sheet and leave; tells them to read a chapter from their textbook; gives them crossword puzzles unrelated to their studies; or otherwise creates busywork.  RSHT saves money but the students gain nothing.

108.    RSHT students also suffer educationally because RSHT does not assign them to the appropriate classes.  RSHT enrolls students throughout the year regardless of what classes it is currently offering and how those classes fit into the curriculum.  For example, RSHT has had students take Anatomy II before Anatomy I, even though Anatomy II requires knowledge from Anatomy I.  This practice allows RSHT to enroll and begin receiving money from students sooner than if RSHT waited to enroll the student until it was offering the entry level class.  The practice does not benefit the students educationally.  To the contrary, practices like this minimize any benefit students gain from attending RSHT.

109.    RSHT also maximizes its income at the expense of students by manipulating classroom results to keep students in its programs who are not succeeding.  The student body at RSHT, like any school, includes some students who are not passing or attending their classes. RSHT does not want these students to fail out or drop out because RSHT would then not receive any more financial aid dollars for them.  School administrators therefore change students' grades and attendance records to reflect better results than the students are actually achieving, which allows RSHT to keep them enrolled in school.  For the same reason, administrators tell teachers who want to give accurate grades to failing students that they must instead do whatever needs to be done to give passing grades to those students.  Similarly, and over the objections of teachers, school administrators coach students with the correct answers to test questions so that they will pass.  These practices cause students who are not succeeding and who should and would

29

otherwise leave RSHT without incurring any more debt to instead remain at the school and take out more student loans, solely for the financial benefit of RSHT.

110.    RSHT also sacrifices its students' education to enrich itself by refusing to let students attend class if they do not make their small monthly out-of-pocket payments on time. Even if the late payment is only $40, RSHT tells its students that they cannot go to class until they pay.  The bursar at RSHT's Richmond campus even told Plaintiff Sade Battle, who received food stamps while attending the school, that she should sell her food stamps to get money to pay the $40 she was required to pay each month.

111.    The practices identified herein reflect only some of the many deceptive, dishonest, and unlawful practices engaged in by RSHT to enrich itself at the expense of its students, who receive little if any educational value in exchange for the money they pay and the debts they incur, and at the expense of the federal government.

112.    In addition to the allegations detailing the experiences of the seven named plaintiffs at RSHT, declarations are attached hereto from an additional forty current and former students documenting RSHT's unlawful practices.  *See* Exs. 1-40.  The experiences of these declarants, like those of the named Plaintiffs, are representative of the experiences of the thousands of students who have enrolled at RSHT and who are members of the class for which Plaintiffs seek certification.

113.    The declarants represent both RSHT campuses and all but one of its programs. These students were induced to enroll at RSHT on the basis of the school's material misrepresentations.  All took out substantial federal student loans to pay for an exceedingly poor education that has done little if anything to improve their career prospects or earning potential, and have been significantly harmed by RSHT's unlawful acts.  These forty declarations

30

corroborate the allegations set forth in this Complaint.  These representative declarations provide clear evidence that RSHT has been and continues to be engaged in perpetrating a deceptive and dishonest scheme designed to enrich itself at the expense of its students and American taxpayers, and that RSHT targets its deceptive and dishonest scheme at African-American and lower-income communities.

### 3.    EXPERIENCES OF THE NAMED PLAINTIFFS AT RSHT

#### A.    Plaintiff Mary Morgan

114.    Plaintiff Mary Morgan learned about RSHT from an advertisement in the summer of 2009.  At the time, she was working as a housekeeper for the Virginia Commonwealth University Health System.  Morgan had previously held a license as a Certified Nurse Aide ("CNA").

115.    Morgan went to RSHT late in the summer of 2009 to learn about RSHT's Community Home Health ("CHH") program.  She met with Deborah Alexander, an admissions officer at RSHT's Richmond campus.  Alexander told Morgan that the certification she would obtain by taking RSHT's CHH program would be a "higher" credential than the CNA certification that Morgan previously held.

116.    Alexander also told Morgan that the CHH program would teach and enable Morgan to start and run her own home health care business.

117.    Alexander told Morgan that the CHH program would give Morgan a "great" education for the money and that the program would boost Morgan's earning capacity by allowing her to obtain a better paying job in home health care than her current job and by allowing her to start her own home health care business.  Alexander told Morgan that Morgan

would benefit from RSHT's career development resources, including a job placement program ensuring that students find employment upon graduation from RSHT.

118.    Alexander also told Morgan that Morgan would not have to give up her full-time day job to attend RSHT's CHH program because RSHT offered classes at night, and that financial aid would help Morgan to pay the tuition of approximately $10,260 for the nine-month CHH program.

119.    Morgan left her meeting with Alexander very interested in and excited about attending RSHT's CHH program because of Alexander's representations.

120.    Morgan met with RSHT again in November 2009.  This time she met with Alexander and Jennifer Glover, a RSHT financial aid officer.

121.    Alexander and Glover both knew that Morgan had previously held a CNA license. Both told Morgan that the certification she would obtain by attending RSHT's CHH program would result in a "higher" licensing credential.

122.    When Morgan expressed concerns to Glover about the cost of the CHH program, Glover told her that completing the CHH program would allow her to get out of housekeeping and into a position as a health care practitioner, and that this would boost her income.

123.    On the basis of RSHT's representations regarding the CHH program, Morgan enrolled on or about November 20, 2009, by signing a written Enrollment Agreement, which a representative of RSHT also signed.  When Morgan enrolled in November, classes were supposed to begin in December.  RSHT later told Morgan that classes had to be delayed until January because the CHH program was not ready.

124.    Glover and Alexander pressured Morgan to complete her enrollment quickly to avoid losing her place in the CHH program.  When Morgan began the CHH classes in January

2010, however, there were only a few other students in the program and her classes were far from full.

125.    Prior to beginning classes, Glover asked Morgan to provide information about her current income, but not any other financial information, for financial aid purposes.  Morgan did not fill out a FAFSA.  Instead, RSHT used the information provided by Morgan to complete a FAFSA for Morgan to sign.  Morgan did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

126.    Morgan received over $9,000 in federal student loans, all of which was used to pay RSHT for tuition.  Glover did not explain Morgan's financial aid package to her or give Morgan ample time to ask questions about the loans that she was taking out.  At Glover's request, Morgan accepted the loans even though she did not understand how long she would have to pay them back, when the repayment period would begin, and other important information about the loans.  In addition to paying RSHT with the proceeds from her federal loans, RSHT also required Morgan to pay $40 to RSHT every month to cover the difference between the financial aid she received and the cost of the CHH program.

127.    When school started and throughout her enrollment at RSHT, RSHT did not provide Morgan and her classmates the necessary and appropriate resources for a proper education.  This included books and laboratory materials.  Although hands-on experience was supposed to be an integral part of the CHH curriculum, the students rarely had access to a lab where they could practice basic caretaking skills using hospital beds and dummies.  The CHH curriculum also did not include any components related to starting or operating a home health care business.

128.    RSHT frequently disrupted Morgan's classes by adding new students.  When new students enrolled in the CHH program, RSHT added them to the current classes without regard to how long ago the classes had started.  The constant influx of new students disrupted classroom progress and students' ability to learn the course material.  RSHT's lack of organization and resources persisted throughout Morgan's time as a student at RSHT.

129.    When she enrolled in the program, Morgan was promised an externship as part of the CHH curriculum that would give her valuable hands-on experience.  The externship that RSHT arranged required her to drive 40 minutes each way to the Petersburg, Virginia area every day for six weeks.  This interfered significantly with Morgan's work schedule.  It also required Morgan to devote a substantial amount of time and money to completing the externship, which was an unexpected and heavy burden.

130.    The quality of Morgan's externship was poor.  The purpose of the externship was to provide practical experience to CHH students, but Morgan's externship provided her with almost no opportunities for hands-on learning.  Morgan merely observed employees of the host organization as they fed, bathed, and otherwise cared for clients.  She did not gain hands-on experience with these tasks herself.

131.    When Morgan had nearly completed RSHT's CHH program in the fall of 2010, she discovered that there was no certification or license in "community home health," and that RSHT did not know what certification or licensing examination she and the other CHH students would take.  Melanie Chewning, a senior RSHT employee, frequently told Morgan in August and September 2010 that she was "not sure" what the CHH students would be able to become credentialed in.

132.    In October 2010, after Morgan had graduated from the CHH program, Chewning told Morgan that she and the other CHH students would sit for the Patient Care Technician ("PCT") exam.  Morgan was upset by this news.  RSHT had promised her certification in community home health and told her it would be a "higher" certification that the CNA license Morgan had previously held.  A PCT certification, however, is a lesser qualification than a CNA license.

133.    RSHT chose to have Morgan and its other CHH students sit for the PCT examination even though the CHH curriculum did not teach students the material tested on the PCT exam.  For example, skills related to taking blood and EKG tests are on the PCT exam but are not covered in the CHH program.  As arranged by RSHT, Morgan took the PCT exam in November 2010.  Because the CHH program was not designed to prepare students for the PCT exam, Morgan did not pass.

134.    Morgan and other students were very upset with how RSHT handled the CHH program and their certification examination.  As a result of their continued complaints, RSHT enrolled the CHH students in a six-week Certified Nurse Aide Training Program at another for-profit school in Richmond, the Professional Career Institute ("PCI").  The PCI course cost approximately $900 and was designed to prepare students to take the CNA licensing exam.  RSHT paid the $900 tuition but did not refund the CHH students any of the more than $10,000 each had paid to RSHT for the CHH program.

135.    Morgan completed the PCI course but could not take the corresponding CNA exam right away because RSHT would not pay the $96 exam fee, even though Chewning had told Morgan that RSHT would pay for it.  Morgan had to save enough money to take the test, which she did.  Morgan passed the CNA exam in May 2011.

136.    Although Morgan paid over $10,000 for and devoted nine months to the CHH program at RSHT, she has ended up with a credential in the very same area – CNA – that she previously held and which required only $900 and six weeks of refresher classes.  RSHT induced Morgan to enroll in the CHH program by promising a greater credential but failed entirely to provide an education commensurate with that promise.

137.    RSHT's promises regarding career development and job placement services have also gone unfulfilled and Morgan has received only minimal assistance.

138.    Morgan spent over $10,000, mostly through debt, for a program that did not remotely provide the education and licensing eligibility promised by RSHT.  Morgan reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.  Morgan's loans have now entered repayment but she is in the same job as she was before enrolling at RSHT and does not have the credentials to move into the type of higher-paying health care job that RHST was supposed to provide.  Morgan is therefore struggling financially and lacks the resources to repay her student loans.

139.    Morgan's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

**B.    Plaintiff Amanda Smith**

140.    Plaintiff Amanda Smith learned about RSHT and its Surgical Technology program from an African-American co-worker at St. Mary's Hospital.  Smith was working, and continues to work, full-time at St. Mary's as a pathology technician.  Smith was living in a predominantly African-American part of Richmond when she learned about RSHT.

141.    Smith phoned RSHT in June 2008 to learn more about the Surgical Technology program.  On or about June 26, 2008, she met with Daphne Patterson, an RSHT admissions

officer.  Patterson told Smith that RSHT's Surgical Technology program would give Smith

everything she needed to become certified as a surgical technician.  Patterson stated that the

program would include three five-week externships arranged by RSHT in hospitals and/or

surgical centers where Smith would obtain operating room experience.  Certification as a

surgical technician requires passing a written examination and a minimum level of operating

room experience.  RSHT represented to Smith through January 2010 that the school would

provide her with the necessary operating room externships.

142.    Patterson also told Smith that the tuition at RSHT would cover the cost of her

certification exam.

143.    Patterson told Smith that finding a job at the completion of the program would be

easy because RSHT would provide extensive job placement and career development services.

Patterson also promised Smith that she would be able to earn more money by taking RSHT's

Surgical Technology program.

144.    Patterson told Smith that because the Surgical Technology program offered night

classes, Smith would be able to keep her full-time job.

145.    Patterson pressured Smith to enroll in RSHT's Surgical Technology program right

away.  On the basis of RHST's representations regarding the Surgical Technology program,

Smith enrolled on or about June 26, 2008.  She signed a written Enrollment Agreement, which a

representative of RSHT also signed.

146.    Smith returned to RSHT approximately a month later and met with Jennifer

Glover, the same financial aid officer who Plaintiff Mary Morgan met with.  Glover had already

completed a FAFSA for Smith and asked Smith to review the FAFSA to verify only her birth

date and other personal information, but not her financial information.  Smith did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

147.    Smith received approximately $20,000 in federal financial aid, all of which was used to pay RSHT for tuition.  All of the financial aid was in the form of student loans.  RSHT did not explain to Smith anything about the terms of the loans, but Glover told Smith that her monthly payment would be under $100 when she had to start paying the loans back.  When Smith had to start paying her loans back in October 2010, however, the monthly payment was approximately $200.

148.    Smith started classes at RSHT in the Surgical Technology program in August 2008.  When school started and throughout her enrollment at RSHT, RSHT did not provide Smith and her classmates the necessary and appropriate resources for a proper education. Among other things, to become surgical technicians students must master numerous instruments used during surgery.  The school did not have nearly enough instruments for the students to use, however.  Students must also, among other things, learn how to put on gowns and gloves in a manner that prevents contamination.  Yet often there were no gowns or gloves for students to use in the lab, preventing them from learning this fundamental skill.

149.    RSHT also failed to provide adequate instruction in the Surgical Technology courses.  For example, when Smith began the mandatory five-week Body Structure and Function class, Mark Russell, an RSHT dean, told Smith and her classmates that they did not have an instructor.  Classes were scheduled from 5:30 p.m. to 10:30 p.m. four days a week.  Russell attended the first thirty minutes each day and assigned students chapters to read and homework to complete.  Russell would read the correct answers to the homework from the answer key, but

the students did not receive any actual instruction in the course material from Russell or anybody else.  Smith was left to learn the material on her own.

150.    New students were continually added to the Surgical Technology program while Smith was enrolled at RSHT, which significantly impaired students' ability to learn the course material.  RSHT placed new students in courses that were currently being taught without regard to the level of the course and whether it was supposed to be preceded by a more basic course.  This prevented students from obtaining basic knowledge and then building on that knowledge to master more advanced material.  Smith was frequently required to take more advanced courses before she completed the corresponding introductory level courses.  This practice greatly interfered with Smith's ability to learn the course material.

151.    The externship opportunities made available to Smith by RSHT were also deficient and far from what Patterson had represented in persuading Smith to enroll at RSHT.

152.    Smith heard rumors in May 2009 that RSHT was not obtaining appropriate operating room externships for all of the Surgical Technology students.  Smith therefore took it upon herself to contact a surgery center and try to arrange an externship on her own.  Smith was successful.  She found a surgery center that agreed to give her an externship with the operating room experience she would need for certification as a surgical technician after graduation, but the center told Smith that RSHT would have to contact it to arrange the externship formally.  Smith gave the necessary contact and other information to RSHT's externship coordinator, Dr. Calvin Brown, in June 2009.  Brown refused to make the necessary phone call despite repeated entreaties by Smith.  Smith was therefore not able to do the externship.  Months later, Smith confirmed with the surgical center that nobody from RSHT ever contacted them about Smith doing an externship.

153.    In October 2009, RSHT scheduled Smith to begin her first five-week externship.

Brown notified Smith that she had been placed with Stony Point Surgery Center.  When Smith

arrived for the first day of the externship, however, no one was expecting her.  The woman who

RSHT told Smith to ask for at Stony Point said that the surgery center had no affiliation or

contract with RSHT, and that she had no idea why Smith was there.

154.    Smith immediately contacted RSHT's new externship coordinator, Dana Johnson.

Johnson told Smith that she had been sent to Stony Point because of a "mistake" and that RSHT

did not have any other operating room externships available.  Johnson told Smith that she could

instead do her first five-week externship in the central sterile unit at Henrico Doctors Hospital,

and that Smith's two other externships would be in an operating room and provide the necessary

experience for certification.

155.    Although the externship in central sterile was not in the operating room – and thus

would not count toward the surgical experience that Smith needed for certification – Smith

agreed to accept the central sterile placement.  She agreed because she had such limited

experience with surgical instruments due to RSHT's failure to provide adequate instruments in

the classroom.  Smith felt that the central sterile externship would at least help to compensate.

156.    In January 2010, when it came time for Smith to do her second externship, she

discovered that RSHT again did not have a placement for her in an operating room.  Johnson told

Smith that she could either complete another five weeks in central sterile at Henrico Doctors

Hospital, or she could leave the Surgical Technology program by going on "academic

interruption" and wait for an operating room placement.  Johnson also told Smith that there was

a six-month waiting list for Surgical Technology students to obtain an externship in an operating

room and that if she turned down the central sterile placement, she would go to the bottom of the

waiting list.  The waiting list was growing because RSHT had continued to admit students into the Surgical Technology program after Smith started taking classes.  Smith concluded that her chances of ever getting an operating room externship from RSHT were virtually nil and accepted a second placement in central sterile.

157.    RSHT also assigned Smith to central sterile for her third and final externship.  As a result, Smith did not gain any operating room experience through her RSHT externships.

158.    Even though her externships were inadequate, Smith had to rearrange her work schedule to accommodate them because Patterson's representation that the Surgical Technology program could be completed in the evenings was false.  This created great hardship for Smith, who was only able to rearrange her work schedule after much effort.

159.    Smith graduated from RSHT in March 2010.  The RSHT curriculum had not prepared her for the surgical technician certification exam, contrary to RSHT's representations to her when she was a prospective student.  She studied for the exam independently using materials she obtained on her own and with extensive tutoring from her fiancé, who is a surgical nurse. Smith took the certification exam on April 9, 2010, and passed because of her independent work. Although RSHT had told Smith that her tuition would cover the cost of the exam, Glover told her in the spring of 2010 that the school would not pay for it.  Smith had to cover the fee for the exam herself, which was almost $200.

160.    Although Smith has passed the written certification exam, she cannot become certified as a surgical technician without the requisite 150 surgical cases.  She was supposed to gain this experience during her RSHT externships but did not because RSHT failed to arrange appropriate externships.

41

161.     Since graduation, Smith has searched all over the Richmond area for a hospital or surgical center to take her as an extern so that she can gain the surgical experience she still needs to become credentialed.  All of the health care facilities she has contacted have turned her down because she is no longer a student covered by insurance and would be a liability in the operating room.

162.     Also since graduation, Smith has applied for twelve surgical technician positions at hospitals and surgical centers in the Richmond area.  She has been denied for all of these positions because of her lack of credentials, lack of experience in an operating room, and/or the poor reputation of RSHT's Surgical Technology program in the health care community.

163.     Smith's student loans entered repayment in October 2010.  She has had to refinance her loans to lower her monthly payment by extending the repayment period, which increases the interest payments she will have to make before her loans are paid off.  Smith is only able to make the reduced monthly payments with financial help from her fiancé and her family.

164.     Smith spent over $20,000, mostly through debt, for a program that did not remotely provide the education and licensing eligibility promised by RSHT.  Smith reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

165.     Smith's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

### C.     Plaintiff Sade Battle

166.     Plaintiff Sade Battle learned about RSHT from a television commercial.  She frequently saw RSHT advertise during television shows that have a large African-American audience, but never saw an advertisement for the school during other television shows.  Battle

42

was interested in entering the nursing profession, and the television advertisements appealed to her because they emphasized that students received a lot of hands-on training and that the school was located "on the bus line."

167.    Battle initially met with RSHT admissions officer Deborah Alexander at the Richmond campus in early 2010.  Alexander pressured Battle to enroll in RSHT's Community Home Health program.  Alexander said that the CHH program offered the quickest opportunity for Battle to get into the nursing profession.  Alexander represented that graduates of the CHH program would become certified in community home health, and that this was a higher credential than a CNA license.  This is the same thing that Alexander told Plaintiff Mary Morgan in 2009.  Alexander also told Battle that the CHH program would cost more than CNA programs.

168.    Alexander made other representations to Battle to persuade her to enroll in the CHH program.  Alexander told Battle that the CHH program would provide extensive hands-on training and showed her the school's lab.  She gave Battle paperwork about RHST that included the statement, under the heading "HANDS ON TRAINING," that "classrooms and labs are designed to give the student the practice to build confidence."

169.    Alexander said that Battle would earn $18 to $21 an hour with her CHH certification and that she would have a job within three months after graduating, well before she would have to start repaying the loans she would need to take out to pay for the program.  Alexander said that RSHT would provide extensive help to Battle in finding a job.

170.    Alexander also told Battle that the school would arrange an externship for her in which she would obtain even more hands-on training.  Battle expressed concern about her ability to do an externship because she faced childcare and transportation obstacles.  Alexander assured Battle that RSHT would work with her to arrange an appropriate and valuable externship that

43

would account for Battle's particular needs.  Alexander knew that Battle could not complete an externship if the externship was located in Petersburg when she made this statement.

171.    Battle spoke with Alexander several times about enrolling in the CHH program. Alexander told Battle that she should enroll right away because the program was filling up and Alexander could not save Battle a place.  Battle eventually agreed to enroll on the basis of RHST's representations regarding the CHH program.  She signed a written Enrollment Agreement, which a representative of RSHT also signed.

172.    Battle also met with RSHT financial aid officer Philip Knight.  Knight completed Battle's financial aid paperwork and had her sign the documents.  Knight did not clearly explain the documents and Battle did not have a sufficient understanding of them.  Battle did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

173.    Knight also told Battle that she would have to pay $40 out of her own pocket every month.  Overall, the CHH program cost Battle more than $10,000, over $6,000 of which she paid for with federal student loans.

174.    Battle began classes in March 2010.  She quickly discovered that her classes were not full despite Alexander's representations that they were filling up quickly.

175.    Battle was particularly distressed to find that the CHH program included very little hands-on training.  In the entire time she attended RSHT, Battle was only in the lab a few times.  The first time Battle was in the lab, her instructor was supposed to teach the students how to change catheters and the proper way to make beds.  The lab did not have catheters or sheets, however, and the students were told to pretend they were changing catheters and sheets.

44

176.    Battle's education was also negatively affected because RSHT often did not have classrooms available for her classes.  The students would have to wait in the hallway during scheduled class time until a room became available.

177.    In the summer of 2010, Battle, like Plaintiff Mary Morgan, learned that there was no certification or state license in "community home health," and that RSHT did not know what certification examination she and the other CHH students would take.  Because the CHH program was in such disarray, Battle decided to withdraw and wait until RSHT had a plan to resolve this fundamental problem with the program.

178.    Several months later, Battle learned from RSHT students and an instructor that RSHT was going to send the CHH students to the Professional Career Institute to take that institution's six to eight week CNA course.  Battle called RSHT and received confirmation of these plans from RSHT staff, including Melanie Chewning.  Battle was unhappy because this would extend the length of the CHH program, but decided to return because at least it would give her some kind of credential to show for the considerable time and money she had already devoted to the program.  Battle resumed classes in February 2011.

179.    In addition to completing her remaining classes, RSHT required Battle to complete her externship before RSHT would pay for the CNA class at PCI.  RSHT's externship coordinator, Ms. Wood, only gave Battle one day's notice of when her externship was to begin and told Battle that the externship would be at a home health service provider in Petersburg.  Wood did not know what Battle's schedule would be at the externship site.

180.    This was not sufficient notice for Battle to rearrange her schedule and accommodate her childcare and transportation requirements.  Battle nonetheless tried to work with Wood to find a solution that would allow Battle to complete her externship, even if it meant

45

going to Petersburg every day.  Wood was uncooperative and Battle was left with a choice between losing her job so that she could do the externship arranged by Wood or giving up on RSHT.

181.    Battle had no real option but to leave the CHH program because she relied on her job to support herself and her family.  Moreover, by this time Battle had learned that CNA positions typically pay only $10 an hour or less.

182.    Battle now works with mentally ill patients in a residential environment.  She found this job, with no assistance from RSHT, in June 2011.  She earns $11 an hour.  Battle's job requires her to perform some of the tasks that she should have learned at RSHT but was not taught.  Her employer has been very helpful in teaching her how to do these things and in providing the necessary training.  Battle's education at RSHT did not prepare her for this job.

183.    Battle's student loans have not yet entered repayment but are scheduled to enter repayment shortly.  She does not know how she is going to be able to make the monthly payments when her loans become due.

184.    Battle spent thousands of dollars, mostly through debt, for a program that did not remotely provide the education and certification promised by RSHT.  Battle reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

185.    Battle's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

### D.    Plaintiff La-Deva Dabney

186.    Plaintiff La-Deva Dabney learned about RSHT when she was working as a pharmacy technician at Wal-Mart in 2006.  Dabney had earned her state license as a pharmacy

technician by attending a program at John Tyler Community College and passing the required examination.  She had held this job for approximately eight years.

187.    Before working at Wal-Mart, Dabney served in the United States Army and was honorably discharged.

188.    Dabney wanted to leave her position as a pharmacy technician to earn more money; to find a job where she did not have to be on her feet most of the day because she suffers from arthritis in her knees; and because she was interested in moving into the field of insurance.

189.    Dabney went to RSHT's Chester campus in 2006 to learn about the school's Medical Billing and Coding program.  The admissions officer told Dabney that RSHT would give her valuable training, including an externship to obtain real world experience in the field. The admissions officer said that Dabney would be able to obtain a job in medical billing and coding if she went to RSHT and that RSHT would give her extensive assistance in finding a job after graduating.  The admissions officer told Dabney that she would be able to earn $36,000 to $38,000 a year.  This represented a substantial increase in earning ability because Dabney was earning $10 an hour at Wal-Mart at the time.

190.    On the basis of RSHT's representations regarding the Medical Billing and Coding program, Dabney enrolled by signing a written Enrollment Agreement, which a representative of RSHT also signed.

191.    Dabney took out over $13,000 in federal student loans and also received federal Pell Grants to pay RSHT's tuition.  RSHT largely completed her financial aid forms and did not effectively explain the terms of the loans to her.  Dabney did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

192.    Dabney began classes in May 2006.  She completed the program in October 2007.

47

193.    Dabney found that many of her classes at RSHT were of little educational value. Many of her teachers lacked the necessary knowledge and qualifications to teach the subject. Many also did not prepare adequately for class.

194.    At one point Dabney did not even have a teacher for one of her classes. The initial teacher left in the middle of the module and RSHT then sent the school librarian to sit in the class with the students each day and take attendance. The new teacher RSHT eventually assigned to the class to finish the module was not qualified to teach the course.

195.    RSHT also failed to provide Dabney and her classmates with up to date books. Current coding books are crucial for students to learn how to do medical billing and coding correctly. The books that the students paid for as part of their tuition, however, were out of date. A critical text in the field is the ICD-10, which is the tenth and current revision of the International Statistical Classification of Diseases and Related Health Problems. It has been in use for over ten years. Dabney and the other students in her classes were given the ICD-9 by RSHT, which only remains in use to a limited extent and is not sufficient for a proper education in the field. Because the tenth revision of the ICD was extensive, knowing how to use the ICD-9 does not easily translate into an adequate understanding of how to use the ICD-10.

196.    RSHT also failed to provide Dabney with an externship. Instead, RSHT assigned Dabney to do a so-called externship by sitting in RSHT's library for five weeks and doing practice exercises in a book.

197.    Dabney recognized that the education she received at RSHT was not remotely sufficient for her to pass the medical billing and coding certification exam. She therefore studied extensively on her own, including a great deal of material that was not part of the RSHT

curriculum.  Dabney passed the examination by a small margin and obtained her certification.

She would not have passed if she had only studied the material she was taught at RSHT.

198.     Even though Dabney obtained her certification and graduated from RSHT, she

was not able to find a job in the field she studied.  She frequently requested assistance from

RSHT in her job search but received minimal help.  Dabney looked for approximately a year

after finishing the program but eventually was forced to accept a government position as a

management assistant.  Her duties as a management assistant bear no relation to her studies at

RSHT.  She believes that RSHT's poor reputation is at least in part to blame for her inability to

find a job in medical billing and coding.  Dabney allowed her certification to expire because she

found it to be of so little value and she would have had to spend more money to renew it.

199.     Because she was not able to get the kind of good job in medical billing and coding

that RSHT promised, Dabney has now gone back to school to earn a bachelor's degree from a

different institution.  In deciding what school to attend, she could not find any in the Richmond

area that would accept the credits she earned at RSHT for her medical classes.  Only two schools

would accept any credits for the general education classes Dabney took at RSHT, and one of

those schools rejected the credits for the bulk of her general education classes.

200.     Dabney has been able to defer her loan repayments because she is in school again.

If her loans were not deferred, Dabney does not know how she could afford to repay them.

201.     Dabney spent over $20,000, mostly through debt, for a program that did not

remotely provide the education promised by RSHT.  Dabney reasonably believed RSHT's

promises, but RSHT did not make a good faith effort to fulfill them.

202.     Dabney's experience as a prospective student and student at RSHT are typical of

the experiences of others who have enrolled at RSHT.

### E.     Plaintiff Kyra Franklin

203.     Plaintiff Kyra Franklin learned about RSHT and the Surgical Technology program from a television commercial in 2007.  Franklin called RSHT and set up an appointment to meet with Jacqueline Johnson, an RSHT admissions officer at the Chester campus, regarding the Surgical Technology program.

204.     Franklin met with Johnson in October 2007.  Johnson told Franklin that the Surgical Technology program would offer Franklin everything she needed to begin her career as a certified surgical technician, and that the whole program would be covered by RSHT's tuition, including books and uniforms.

205.     Johnson also told Franklin that it would not be difficult to find a good job upon completion of the program.  Johnson stated that there were many jobs available in the field and that RSHT would provide extensive career assistance, including helping Franklin with her resume and job placement.  Johnson told Franklin she was guaranteed a job after graduating from RSHT, and that her starting salary as a surgical technician would be $50,000 to $60,000 per year.

206.     Franklin was a nursing student at another area school when she was considering enrollment at RSHT.  Johnson told Franklin that she would earn more money by completing the Surgical Technology program than if she completed the nursing program she was already enrolled in.

207.     Franklin asked about the school's accreditation and Johnson stated that the school was fully accredited and that the credits she earned at RSHT would transfer to other educational institutions.

208.     On the basis of RSHT's representations regarding the Surgical Technology program, Franklin enrolled in or around October 2007.  She signed a written Enrollment Agreement, which a representative of RSHT also signed.

209.     Before beginning classes, Franklin also met with an RSHT financial aid officer. The financial aid officer helped Franklin complete her financial aid paperwork, including her FAFSA.  Franklin did not submit her financial aid forms to the Department of Education herself. Instead, RSHT submitted the forms.

210.     Franklin received approximately $15,000 in federal financial aid in the form of student loans to attend RSHT.  She also took out over $6,000 in loans from Sallie Mae to cover the rest or almost all of the rest of her tuition.

211.     Franklin started classes at RSHT in November 2007.  When school started and throughout her enrollment at RSHT, RSHT did not provide Franklin and her classmates the necessary and appropriate resources for a proper education.  Medical instruments, the most important equipment for the Surgical Technology program, were in short supply and out of date. Moreover, students were given one gown and one scrub set to use for the entire program, even though fresh gowns and scrub sets must be used for each operating room procedure.  As a result, students did not gain basic familiarity with putting on their gowns or scrubbing their hands in the correct manner to prevent contamination in an operating room.

212.     Franklin also had to purchase her own uniform, even though Johnson had told her that the cost of uniforms was included in tuition.

213.     RSHT also failed to provide adequate instruction in the Surgical Technology courses.  For example, instructors often read material directly from the textbook and were not able to answer students' questions or provide any insight into working in the field.  Classes were

51

so lacking in content that instead of lasting from 8:00 a.m. to 1:00 p.m., as scheduled, students were often released hours early.

214.    Franklin did not even have an instructor for her Medical Terminology course for weeks.  RSHT merely sent an instructor from another program into the classroom to assign worksheets.  The teacher told Franklin and her classmates that as soon as they finished the worksheets, they should leave.  No instruction was offered during this time, and Franklin was forced to learn the material on her own.

215.    At the beginning of her education at RSHT, Franklin learned that the preferred certification for surgical technicians is the certification awarded by the National Board of Surgical Technology and Surgical Assisting ("NBSTSA").  This certification is recognized by the Association of Surgical Technologists ("AST").  For students to be eligible for the NBSTSA certification, they must attend a school accredited by the Commission on Accreditation of Allied Health Education Programs ("CAAHEP").

216.    Franklin and her classmates asked RSHT whether RSHT students would be eligible to sit for the AST-recognized certification exam at the end of the program.  Sandra Kerrick, a senior RSHT administrator, assured students that the proper paperwork had been submitted to get the program accredited by CAAHEP, and that the students would have no problem getting certified by the AST at the end of the program.  RSHT instructors also reassured students that they would be eligible to sit for the NBSTSA certification exam at the culmination of the program and become certified by the AST.

217.    About one year into the program, Kerrick told the students that they would instead sit for the certification exam offered by the National Center for Competency Testing ("NCCT").  Kerrick told students that it was "just as good" as the NBSTSA certification because it was also a

national exam and the students would still be certified at the end of the program.  Franklin and

other students, however, researched the NCCT exam and learned that employers in the

Richmond area generally do not recognize NCCT certification for surgical technicians.

218.    Franklin was upset at this news, but Johnson told her at the time of enrollment

that if Franklin quit the program mid-way through, she would still be responsible for repaying

loans based on the full cost of the program.

219.    Upset with RSHT's handling of certification, but believing that she could not quit

the program without incurring the full cost of tuition, Franklin went back to Kerrick and

complained.  Kerrick again told Franklin that the school was in the process of getting accredited

by the CAAHEP.  RSHT continued to represent to Franklin and her classmates until the day that

they graduated that the school would be accredited by the CAAHEP and that they would

therefore be able to obtain NBSTSA certification based on their graduation from RSHT.

220.    The externship opportunities made available to Franklin by RSHT were also

deficient and did not prepare Franklin for entry into the field as a certified surgical technician.

221.    RSHT arranged for Franklin to complete her first of three 5-week externships in

central sterile, sterilizing and packing surgical instruments, and her second and third 5-week

externships in hospital operating rooms.  Franklin considered herself lucky to get a placement in

the operating room because there were not enough operating room placements for all of the

Surgical Technology students.  An operating room externship placement was essential for getting

the 150 surgical procedures needed for certification.  Some of Franklin's classmates had to take

time off from the program until an operating room placement became available, while many

others were never able to obtain an operating room placement at all.

222.    Although Franklin completed two externships in the operating room, this only allowed her to complete approximately 50 surgical procedures – just a third of what is required for certification.  When Franklin expressed concern to Kerrick about not completing the 150 surgeries, Kerrick told Franklin that she should be counting every procedure she saw in the operating room, even those procedures in which she did not participate.  Franklin believed this was dishonest and not in accordance with the certification rules.  She therefore refused to follow Kerrick's instructions.  As a result, she finished the program far short of the required surgeries, as did most of her classmates.

223.    Franklin graduated from RSHT in July 2009.  Upon graduation, Franklin realized that RSHT's promises about the students becoming eligible to take the NBSTSA certification exam were not true and would not be fulfilled, and that the NCCT certification was the only option available to her.  Because NCCT certification is generally not recognized in the Richmond area, Franklin did not take the NCCT exam.  Moreover, Franklin knew that even if she did take and pass the NCCT exam, she would still be ineligible for certification because RSHT's externships had not provided her with the necessary 150 surgical procedures.

224.    After she graduated, Franklin searched for a job as a surgical technician for approximately a year and a half.  She applied for approximately 75 positions but was not offered one even though she graduated second in her class at RSHT.  Franklin's lack of the NBSTSA certification and the poor reputation of RSHT's Surgical Technology program in the health care community are largely responsible for her inability to find a job.

225.    Moreover, RSHT has provided no meaningful job placement assistance.  For example, Franklin never received a response when she sent her resume to RSHT for the career services office to review.

54

226.    Even if Franklin could find a job as a surgical technician, she now knows that entry-level surgical technicians generally earn $30,000 per year or less, not $50,000 as RSHT represented to her.

227.    Because RSHT failed to provide any credential that would enhance her career prospects, Franklin has returned to the nursing program that she was enrolled in before attending RSHT.  As a result, her federal student loans are currently in deferment.  Her Sallie Mae loans, however, have entered repayment.  She is only able to make these loan payments with her husband's financial assistance.

228.    Due to the financial strain on her family, Franklin has recently started working at a department store where she earns $8.50 per hour.

229.    Franklin borrowed over $22,000 for a program that did not remotely provide the education promised by RSHT.  Franklin reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

230.    Franklin's experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

### F.    Plaintiff Ashley Thomas

231.    Plaintiff Ashley Thomas learned about RSHT from a relative who is also African-American.  Thomas contacted the school for information about its programs in early 2009. While a student at RSHT, Thomas frequently saw RSHT commercials on BET and heard them on hip-hop radio stations.

232.    In February 2009, Thomas met with Amy Wright, an admissions officer at RSHT's Chester campus to learn more about the Pharmacy Technician program.  Wright told Thomas that the program was new, offered a great education that could be completed quickly,

and would facilitate Thomas' entry into a career in health care. Wright said that RSHT offered one-on-one instruction in small class settings. She also told Thomas that RSHT had a high success rate, with the vast majority of students graduating.

233.     Wright represented to Thomas that RSHT would provide everything she needed to begin her career as a pharmacy technician, and that it would all be covered by RSHT's tuition. Wright said that this included the cost of taking the certification exam at the end of the program, which is required for licensing by the Virginia Board of Pharmacy.

234.     Wright also told Thomas that it would not be difficult to find a job upon completion of the program that would pay $60,000 a year. Wright said that while RSHT could not promise Thomas a job, the school provided extensive job placement assistance and would continue to assist her after she graduated to make sure that she found a job.

235.     Wright told Thomas that she would qualify for federal financial aid in the form of grants, and that RSHT would take care of all of the paperwork.

236.     On the basis of RHST's representations regarding the Pharmacy Technician program, Thomas enrolled in or around February 2009. She signed a written Enrollment Agreement, which a representative of RSHT also signed.

237.     Before beginning classes, Thomas also met with one of RSHT's financial aid advisors, who completed all of Thomas' financial aid paperwork for her, including her FAFSA, and asked Thomas to sign. The financial aid officer told Thomas she was going to apply for federal student tuition grants on Thomas' behalf, but did not say anything about applying for student loans. Thomas did not submit her financial aid forms to the Department of Education herself. Instead, RSHT submitted the forms.

238.     Approximately one to two months into her program, Thomas learned for the first time that RSHT had applied for federal student loans on her behalf.  Thomas received over $4,000 in the form of federal student loans that were applied to RSHT's tuition of over $12,000.

239.     Before Thomas began classes, neither Wright nor the financial aid officer told Thomas that she would also be required to pay RSHT $40 per month during the 10-month Pharmacy Technician program.  During the first month of class, the same financial aid officer came into Thomas' classroom and announced to the class that they were responsible for these payments.  Thomas and other students complained about not receiving this information sooner, and were told that the money was necessary for RSHT to "keep the lights on."  Making these payments caused a great deal of financial stress because Thomas was unemployed at the time.

240.     Thomas started classes in March 2009.  Soon after classes began, RSHT asked students to complete a survey that asked what television channels they watched and what radio stations they listened to.  Upon information and belief, RSHT was collecting this information to target its marketing activities.

241.     Throughout her enrollment at RSHT, RSHT did not provide Thomas and her classmates the necessary and appropriate resources for a proper education.

242.     For example, although Wright had represented that the program had small class sizes that allowed for one-on-one instruction, Thomas' classes at times included approximately 30 students.  This precluded the type of one-on-one instruction described by Wright.  This was not the classroom environment she had expected based on RSHT's representations.

243.     RSHT also failed to provide adequate instruction.  For example, in one of Thomas' required courses, there was no teacher.  As a result, RSHT sent in Sandra Kerrick, an administrator, to try to teach the class, even though Kerrick did not have appropriate

57

qualifications to teach the course.  On another occasion when the students were without a teacher, an instructor from the Medical Assistant program came in to substitute.  She also had no experience with the material being taught.  As a result, Thomas was left to learn much of the course material on her own.

244.   RSHT frequently disrupted Thomas' classes by adding new students.  When new students enrolled in the Pharmacy Technician program, RSHT added them to the current classes without regard to how long ago the classes had started.  The constant influx of new students disrupted classroom progress and students' ability to learn the course material.  For example, when Thomas and two others began the program, they were put in a class with six other students who were about to graduate.  When she complained that it was difficult to be a new student in a classroom where so many students had already developed a background in the subject matter, RSHT told her that nothing could be done about it because the program was open enrollment. Thomas was not told this before she enrolled.

245.   The externship opportunities provided by RSHT were also deficient and not at all what Thomas had anticipated or expected based on RSHT's representations.  The externship arranged by RSHT was supposed to provide Thomas with hands-on experience with both pharmacy and retail functions, but Thomas' only task was counting pills.  Thomas complained to Kerrick because the externship was not preparing her for many of the important tasks that a pharmacy technician must handle.  RSHT did not do anything to try to help.

246.   Thomas graduated from RSHT in January 2010.  Thomas did not take the examination to become a licensed pharmacy technician upon graduation because she recognized that her coursework at RSHT had not prepared her to pass the exam.

247.    Thomas learned at her externship that pharmacy technicians who graduated from an approved program could work at a pharmacy for a short period, but then had to become licensed by the Virginia Board of Pharmacy. After she graduated, Thomas found a job in April 2010 and was able to work as a pharmacy technician, but she was laid off in September 2010 because she was not licensed. She applied for other pharmacy technician jobs after she was laid off but was not successful. RSHT has not provided the job placement assistance it promised.

248.    In the spring of 2011, Thomas decided to take the certification exam to increase her ability to find a permanent position as a pharmacy technician. She paid $70 out of pocket to take the Virginia exam in May 2011. Thomas knew that to have any chance to pass the test, she needed to study a large amount of material that had not been part of her education at RSHT. Thomas studied these additional materials, as well as the limited materials that had been covered at RSHT, and prepared extensively for the exam. Despite her diligent efforts to learn the necessary material on her own, Thomas did not pass. RSHT's failure to provide an education that reasonably prepares its students for the pharmacy technician examination is responsible for Thomas not passing.

249.    Thomas is currently unemployed. Her federal student loans have entered repayment, but she cannot afford to make the monthly payments and she is applying for deferment of her repayment obligations.

250.    Thomas borrowed thousands of dollars for a program that did not remotely provide the education needed to obtain a license in her field of study. Thomas reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

251.    Thomas' experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

### G.    Plaintiff Loretta Towns

252.    Plaintiff Loretta Towns learned about RSHT from advertisements, including advertisements on BET and local hip-hop radio stations, in the spring of 2009.

253.    Towns met with Saundra Napier, an admissions officer at RSHT's Richmond campus, to learn more about the Radiologic Technology program in April 2009.  Napier told Towns that the Radiologic Technology program would not be offered at the Richmond campus until 2011, and that Towns would have to add her name to a waiting list if she was interested.

254.    Napier told Towns that there was no waiting list for the Surgical Technology program.  She explained to Towns that surgical technicians in Virginia are the highest paid in the country and earn a starting salary of $16 to $18 per hour.  Napier said that Towns would easily obtain a job with a high salary at the completion of the program and would benefit from RSHT's extensive job placement assistance upon graduation.

255.    Napier also told Towns that completing and graduating from RSHT was all that Towns would need to begin working as a surgical technician, and that all costs of the program would be covered by financial aid.

256.    Napier represented to Towns that RSHT had equipped a student lab with the medical instruments and training materials that students would need to gain sufficient practical, hands-on experience.

257.    Towns was concerned that the Surgical Technology program would interfere with her full-time day job, but Napier assured her that the program could be completed in the evenings and would never impinge on her work schedule.

258.     Napier also told Towns that credits earned at RSHT would transfer to other educational institutions if she wanted to continue her education and earn a bachelor's degree in the future.

259.     After speaking with Napier, Towns met with Jennifer Glover, one of RSHT's financial aid officers.  Glover told Towns that RSHT would take care of all the financial aid paperwork.  Glover explained that RSHT would apply for Pell Grants from the federal government to cover the cost of tuition, and once that was exhausted, RSHT would apply for student loans on Towns' behalf.  When Towns expressed concern about paying the loans back, Glover told Towns that her payments would be under $100 per month.

260.     Glover and Napier told Towns that spots were filling up quickly and that Towns should sign up that day to reserve a place in the Surgical Technology program.

261.     On the basis of RSHT's representations regarding the Surgical Technology program, Towns enrolled the day she met with Napier and Glover, on or about April 15, 2009, by signing a written Enrollment Agreement.  A representative of RSHT also signed the Enrollment Agreement.

262.     Before beginning classes, Glover asked Towns to provide information about her current income and dependents for financial aid purposes.  Towns did not fill out a FAFSA.  Instead, RSHT used the information provided by Towns to complete a FAFSA for Towns to sign.  Towns did not submit her financial aid forms to the Department of Education herself.  Instead, RSHT submitted the forms.

263.     Glover did not explain Towns' financial aid package to her or give Towns ample time to ask questions about the loans that she was taking out.  At Glover's request, Towns

accepted the loans even though she did not understand how long she would have to pay them back, when the repayment period would begin, and other important information about the loans.

264.    Towns received Pell Grants and over $16,000 in federal student loans, all of which was used to pay RSHT over $20,000 in tuition for the Surgical Technology program. Because of how RSHT pushed her during the financial aid application process, Towns did not understand the size of the student loans RSHT had arranged for her until she was many months into the program.

265.    Towns was also required to make a monthly payment of $40 to RSHT while enrolled to cover the difference between the cost of the program and the financial aid Towns received from the federal government.

266.    When Towns started classes in June 2009 and throughout her enrollment at RSHT, RSHT did not provide Towns and her classmates the necessary and appropriate resources for a proper education.  For example, although books were supposed to be included in RSHT tuition, students sometimes went without books for an entire class module or were given books that were years out of date.

267.    Similarly, although Towns had been promised hands-on experience at RSHT, Towns quickly realized that the student lab did not have essential equipment.  For example, becoming a surgical technician requires mastery of medical instruments used during surgery. Because RSHT possessed only a few instruments and most were outdated, students resorted to drawing instruments on paper and then cutting them out to practice with.  Students also lacked gowns, gloves, and scrubbing supplies, which they needed to learn how to use to create and maintain a sterile environment in an operating room.  As a result, students could not adequately learn these fundamental skills.

268.    RSHT frequently disrupted Towns' classes by adding new students.  When new students enrolled in the Surgical Technology program, RSHT added them to the current classes without regard to how long ago the classes had started.  The constant influx of new students disrupted classroom progress and students' ability to learn the course material.  RSHT's lack of organization and resources persisted throughout Towns' time as a student at RSHT.

269.    RSHT also failed to provide Towns with adequate instruction in her courses and she was often left to learn the material on her own.  For example, Towns was required to complete a course entitled Strategies as part of her general education requirements.  The instructor used the scheduled class time to talk with students about personal matters and show movies.  No material was taught.  In a math class, the instructor refused to help when Towns had questions about the material.  The instructor simply told students, "don't worry, you'll get it."

270.    Teacher turnover also created a difficult learning environment for Towns and her classmates.  In one of her Anatomy courses, the students had three or four teachers in one week. In Health Care Concepts, another class required in the Surgical Technology program, two teachers quit mid-module.  RSHT then brought in an administrator, Mark Russell, to teach the course.  He had no background in Surgical Technology.  During these weeks, class consisted only of Russelll assigning material and reading answers out of the book.  Instead of receiving instruction for the full class period, students were dismissed after an hour.  Towns was left to learn the material on her own.

271.    Towns did not learn about the externship component of the program until she started her Surgical Technology classes.  RSHT told her and other students that they would complete one 5-week externship in central sterile learning how to sterilize and pack instruments, and two 5-week externships in an operating room.

272.    Towns did not learn about the process for certification as a surgical technician that RSHT offered through the National Center for Competency Testing until early 2010.  Towns learned from RSHT instructors and classmates that certification through NCCT required a passing grade on a written examination and participation in 150 surgical procedures.  RSHT told Towns that she would gain the knowledge needed to pass the test in her Surgical Technology courses and the experience needed to obtain the 150 procedures in her externships.

273.    Shortly before Towns was to begin her first externship in the fall of 2010, RSHT told Towns that her externship placement would begin at 3:00 p.m. and end at 11:00 p.m.  This schedule conflicted with Towns' full-time day job, which did not end until 4:30 p.m.  When Towns complained to Dana Johnson, the externship coordinator at RSHT, and explained that RSHT had promised her that she could complete the entire program in the evenings, Johnson told her that it was the only externship available.

274.    After much effort, Towns worked out an arrangement with her employer so that she could arrive on time to her externship, but the arrangement required her to exhaust all of her vacation and sick leave.

275.    Towns agreed to accept the central sterile placement even though it would not help her get the 150 surgical procedures she needed for certification.  She agreed because she had such limited experience with surgical instruments due to RSHT's failure to provide them in the classroom, and thought that the central sterile externship would help to compensate.  Towns' externship in central sterile did not even provide this opportunity, however, because it consisted almost entirely of folding towels.  She did not obtain experience working with medical instruments as she had been told and as she had expected.

64

276.     When it came time for Towns to begin her second externship, she discovered that RSHT did not have a placement for her in an operating room.  Johnson told Towns that if she refused to complete another five weeks in central sterile, she would have to leave the Surgical Technology program by going on "academic interruption" and then wait and see if an operating room placement eventually became available.  If Towns chose the second option, Johnson told her she would also have to pay a reapplication fee when she re-joined the program.  Towns reluctantly accepted the second externship in central sterile.

277.     RSHT also assigned Towns to central sterile for her third and final externship.  As a result, Towns did not gain any operating room experience through her RSHT externships.

278.     Towns graduated from RSHT in December 2010.  The RSHT curriculum had not prepared her for the surgical technician certification exam.  Although RSHT told Towns that all costs of entering the profession would be covered by tuition, Towns discovered when it came time to graduate that tuition would not cover the cost of the exam.  Towns did not see the point in taking an examination that her education at RSHT had not prepared her to pass.  Moreover, Towns knew that, even if she did pass the exam, she could not be certified as a surgical technician because she did not have any of the 150 surgical procedures required for certification.

279.     Since graduation, Towns has searched throughout the Richmond area for a position as a surgical technician.  She has not found a position because of her lack of certification, lack of experience in an operating room, and/or the poor reputation of RSHT's Surgical Technology program in the health care community.

280.     RSHT's promises regarding career development and job placement services have also gone unfulfilled and Towns has received only minimal assistance from RSHT in finding a job.

65

281.    Towns is currently employed at Coventry Health Care in a job she began approximately six months after she started at RSHT and without any assistance from RSHT.  Her position is in medical billing and is not at all related to surgical technology or her training at RSHT.  Towns earns considerably less than what Napier told her she would earn upon graduating from the Surgical Technology program.

282.    Because RSHT's education failed to provide Towns with any opportunity for career advancement, Towns has looked into attending another educational institution to earn her bachelor's degree.  Contrary to the promises RSHT made to Towns when she enrolled, however, Towns has not found any schools in the Richmond area that are willing to count RSHT's credits toward a bachelor's degree.

283.    Towns' student loans have recently entered repayment.  While Glover had told Towns that her monthly loan payments would be under $100, they are approximately twice that amount.  Towns is struggling financially and is unable to afford such high payments.  She has requested forbearance, but worries about how she will afford to pay back the loans when the forbearance period ends.

284.    Towns incurred over $16,000 in debt for a program that did not remotely provide the education promised by RSHT.  Towns reasonably believed RSHT's promises, but RSHT did not make a good faith effort to fulfill them.

285.    Towns' experience as a prospective student and student at RSHT are typical of the experiences of others who have enrolled at RSHT.

4. **DEFENDANT ENGAGES IN "REVERSE REDLINING" BY TARGETING AFRICAN AMERICANS AND RESIDENTS OF LOW-INCOME NEIGHBORHOODS FOR ENROLLMENT AT RSHT**

286.     RSHT targets African Americans for enrollment at RSHT.  It similarly targets low-income neighborhoods of the Richmond area.

287.     The population of the greater Richmond area is 30.1% African-American, but the student body at RSHT is 75% African-American.

288.     This disparity is little changed by considering only the population 25 years old or older whose highest educational attainment is a high school diploma or GED certificate (that is, the part of the population more likely to be interested in for-profit vocational colleges in the area).  Only 33.8% of this part of the population in the greater Richmond area is African-American.

289.     This extreme disparity between the racial makeup of RSHT's students and the population from which those students are drawn is the direct result of Defendant's pattern or practice of intentionally targeting African Americans and residents of low-income neighborhoods for enrollment at RSHT.

290.     Upon information and belief, RSHT targets African Americans because it believes that African Americans are unsophisticated.  It believes that it can take advantage of and manipulate African Americans into taking out large federal loans without appropriately considering and appreciating the long-term consequences of such debt and the poor quality of RSHT's educational programs.

291.     RSHT targets low-income neighborhoods for comparable reasons and because people with less financial resources are eligible for a broader range of federal financial aid, which is the cornerstone of RSHT's scheme to enrich itself.  RSHT even asks prospective

students if they receive food stamp benefits and considers people who answer affirmatively to be more desirable because it indicates likely eligibility for Pell Grants and other means-tested federal financial aid.  RSHT's practice of targeting low-income neighborhoods has a disparate impact on African Americans because it leads disproportionately to the enrollment of African Americans at RSHT.

292.   RSHT targets African Americans by intentionally gearing its marketing efforts to channels that disproportionately reach an African-American audience.  This includes, but is not limited to, advertising on the BET ("Black Entertainment Television") channel; advertising on additional television channels during shows that have a disproportionately high African-American viewership but not during other shows; and advertising on Richmond hip-hop radio stations 92.1 FM and 106.5 FM.  RSHT's advertising emphasizes that RSHT is located "on the bus line."  This is a euphemism that RSHT uses intentionally to portray itself as a school for African Americans and to target African-American communities that rely disproportionately on Richmond's public transportation system.  In addition, RSHT's Chester campus targets prospective students in Petersburg, a majority African-American city that is farther away from the school than areas that are not majority African-American.

293.   RSHT targets African Americans and residents of low-income neighborhoods through other marketing techniques.

294.   RSHT's other marketing techniques include but are not limited to distributing flyers, going to job fairs, phoning people on lists of "leads" that the school obtains, going door to door, and conducting open houses.  At the open houses, RSHT tells prospective students that health care is a booming area that is generating many new and good jobs.  Upon information and belief, RSHT also represents at the open houses that attending RSHT will make the prospective

68

students qualified for those jobs. RSHT also says that it will help the prospective students obtain financial aid to pay for RSHT. The fundamental message that RSHT seeks to convey at the open houses is that after attending RSHT, people will not have any trouble finding a job that pays well. RSHT markets itself in this manner knowing that its graduates do not do well in finding jobs in their field of study, but the school intentionally withholds this information from prospective students.

295.    RSHT's policy of targeting African Americans and residents of low-income neighborhoods in the Richmond area is the direct reason why 75% of RSHT's students are African-American while the percentage of African Americans in the population from which RSHT's students are drawn is much lower.

296.    By targeting its deceptive and unlawful programs at and in a manner that disparately impacts African Americans, RSHT causes harms that go well beyond the tuition dollars for which its students receive no commensurate benefit. The student loans that RSHT persuades its students to take out frequently are unmanageable and result in default. This destroys credit ratings, which is especially harmful in African-American communities because they have traditionally been denied equal access to credit. This significantly impedes these students' ability to obtain credit and find employment in future years. RSHT's practices make it harder for these students to buy a car or a home, or to take out loans for a legitimate education that will improve their economic opportunities. Impaired credit also makes it harder to find a job because employers often obtain credit reports as part of background checks.

## CLASS ALLEGATIONS

297.    Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

298.    Plaintiffs request that this Court certify a class of all persons who are enrolled at RSHT or have been enrolled at RSHT at any time since it opened in 1997.  Plaintiffs are members of the class they seek to represent.

299.    Plaintiffs also request that this Court certify a subclass of all African Americans who are enrolled at RSHT or have been enrolled at RSHT at any time since it opened in 1997 pursuant to Fed. R. Civ. P. 23(c)(5).  Plaintiffs understand and are informed that most members of the class described in paragraph 298 are also members of this subclass.  Plaintiffs Mary Morgan, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns are members of the subclass they seek to represent.

300.    This action is properly maintained as a class action because:

a)    Joinder of all class members is impracticable because of the size of the class. Current RSHT enrollment exceeds 600 students, and Plaintiffs are informed and believe that the class includes thousands of students because the class period covers approximately 14 years.

b)    Defendant has acted or refused to act on grounds generally applicable to the class.

c)    The claims alleged on behalf of the class and subclass raise questions of law and fact that are common to the class and subclass and predominate over questions affecting only individual members because all class members enrolled in the same school on the basis of the same or similar representations, entered into the same or similar written contracts with Defendant Richmond School of Health and Technology, Inc., and received the same quality of education.  Common questions of law and fact include, among others:  (i)

70

whether Defendant intentionally targeted African Americans in violation of
the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* and Title VI of the
Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; (ii) whether Defendant's
policies and practices have a disparate impact on African Americans in
violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; (iii)
whether any disparate impact is justified by business necessity; (iv) whether
Defendant committed fraudulent acts or practices in violation of the Virginia
Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; (v) whether
Defendant Richmond School of Health and Technology, Inc. breached its
contractual obligations to the class members; (vi) whether Defendant
fraudulently induced class members to enroll at RSHT by knowingly making
false misrepresentations; and (vii) whether class members are entitled to an
injunction requiring RSHT to pay off the balance of their student loans.

d)   The claims of the class representatives are typical of the class because the
class representatives enrolled in the same school as the other class members
on the basis of the same or similar representations, entered into the same or
similar written contracts with Defendant Richmond School of Health and
Technology, Inc. as the other class members, and received the same quality of
education as the other class members.

e)   A class action is superior to other available methods for fairly and efficiently
adjudicating this litigation.

301.   The class representatives and class counsel will fairly and adequately represent
the interests of the class.  The class representatives have no interests that are antagonistic to the

interests of other Plaintiffs and class counsel have years of experience in civil rights, consumer, and class action litigation.

## INJURY TO NAMED PLAINTIFFS

302.    Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns have suffered and continue to suffer financial injuries as a direct, foreseeable, and proximate result of Defendant's past and ongoing actions set forth above.  Plaintiffs have paid large sums of money to attend RSHT, mostly by taking out large student loans.  In the absence of Defendant's actions, Plaintiffs would not have paid this money and taken out these loans and/or would have gained from RSHT the necessary skills, knowledge, and experience to obtain gainful employment in their field of study allowing them to earn the income needed to manage their student loans.

303.    As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered additional financial injuries because they have lost past wages.  Plaintiffs have devoted significant time to attend and study for classes at RSHT.  In the absence of Defendant's actions, Plaintiffs would otherwise have devoted that time to working at paying jobs.

304.    As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered additional financial injuries because they will lose future wages.  In the absence of Defendant's actions, Plaintiffs would have received an education that enhanced their future earning capacity by allowing them to work in jobs in their field of study.

305.    As a direct, foreseeable, and proximate result of Defendant's actions, Plaintiffs have suffered, and in the future will continue to suffer, humiliation, embarrassment, and mental and emotional distress.

306.     In causing injury to Plaintiffs, Defendant acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for Plaintiffs' rights.

307.     Without relief, Plaintiffs are also likely to be injured by damaged credit. Repayment of federal student loans must begin soon after graduation, and Plaintiffs are now required, or are about to be required, to make monthly payments that they cannot afford.  If they default on their student loans it will substantially impair their ability to get credit in the future.  It will also substantially impair their ability to find new employment because credit reports are often used by employers as part of background checks.

## CAUSES OF ACTION

### Count I – Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

308.     Plaintiffs Mary Morgan, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 307 above.

309.     Defendant is a "creditor" within the meaning of 15 U.S.C. § 1691a(e).

310.     Plaintiffs have been "applicants" within the meaning of 15 U.S.C. § 1691a(b) when they have applied for an extension, renewal, or continuation of student loans.

311.     Defendant's acts, policies, and practices are intentionally discriminatory against African Americans with respect to aspects of credit transactions, constitute reverse redlining, and violate 15 U.S.C. § 1691(a)(1).

312.     Defendant's acts, policies, and practices disparately impact African Americans with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

**Count II – Violation of Title VI of the Civil Rights Act of 1964,
42 U.S.C. § 2000d *et seq.***

313.    Plaintiffs Mary Morgan, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley

Thomas, and Loretta Towns reallege and incorporate by reference all of the allegations set forth

in paragraphs 1 through 312 above.

314.    Defendant receives "Federal financial assistance" within the meaning of 42

U.S.C. § 2000d as the recipient of its students' federal financial aid dollars.

315.    Upon information and belief, Defendant Richmond School of Health and

Technology, Inc., in its own name or doing business as RSHT or one of the school's alternative

names, has entered into one or more Program Participation Agreements with the United States

Department of Education pursuant to 34 C.F.R. § 668.14 in which it explicitly acknowledges,

*inter alia*, that it must comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

316.    Defendant's acts, policies, and practices are intentionally discriminatory against

African Americans, subject African Americans to intentional discrimination in Defendant's

programs and activities, constitute reverse redlining, and violate 42 U.S.C. § 2000d.

**Count III – Violation of the Virginia Consumer Protection Act,
Va. Code Ann. § 59.1-196 *et seq.***

317.    Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra

Franklin, Ashley Thomas, and Loretta Towns reallege and incorporate by reference all of the

allegations set forth in paragraphs 1 through 316 above.

318.    Plaintiffs' enrollment at RSHT to receive educational services constitutes a

"consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

319.    Defendant committed fraudulent acts or practices with respect to Plaintiffs' enrollment at RSHT in violation of Va. Code Ann. § 59.1-200(A), including subsections (5), (6), and (14).

### Count IV – Breach of Contract

320.    Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 319 above.

321.    Each Plaintiff entered into a written contract (*i.e.*, the Enrollment Agreement) with Defendant Richmond School of Health and Technology, Inc.

322.    Each contract contained an implied covenant of good faith and fair dealing.

323.    Defendant Richmond School of Health and Technology, Inc. violated the implied covenant of good faith and fair dealing by exercising its contractual discretion in bad faith and failing to provide Plaintiffs with an education adequate to prepare them for gainful employment in their field of study.

### Count V – Fraudulent Inducement to Contract

324.    Plaintiffs Mary Morgan, Amanda Smith, Sade Battle, La-Deva Dabney, Kyra Franklin, Ashley Thomas, and Loretta Towns reallege and incorporate by reference all of the allegations set forth in paragraphs 1 through 323 above.

325.    Defendant, to induce Plaintiffs to enter contracts with Defendant Richmond School of Health and Technology, Inc., made positive statements of fact regarding the quality and content of the education provided by RSHT that were false, material to the contract, and relied upon by Plaintiffs in deciding to enroll at RSHT.

326.    Defendant knew that its statements regarding the quality and content of the education provided by RSHT were false at the time they were made and did not intend that RSHT would satisfy the statements at the time they were made.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant it the following relief:

(1)    Enter a declaratory judgment that the foregoing acts, policies, and practices of Defendant violate the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; violate the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196 *et seq.*; constitute breach of contract; and constitute fraudulent inducement to contract;

(2)    Enter an injunction enjoining Defendant and its directors, officers, agents and employees from engaging in the conduct described herein and directing Defendant and its directors, officers, agents and employees to take all affirmative steps necessary to remedy the effects of the conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future, including but not limited to requiring Defendant to pay off the balance of Plaintiffs' student loans;

(3)    Award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for their injuries caused by the conduct of Defendant alleged herein, including but not limited to the compensation for the funds Plaintiffs have paid out-of-pocket for tuition at RSHT;

(4)    Award treble damages to Plaintiffs pursuant to Va. Code Ann. § 59.1-204(A) for Defendant's willful violation of the Virginia Consumer Protection Act;

(5)     Award punitive damages to Plaintiffs in an amount to be determined by the jury

that would punish Defendant for the willful, wanton and reckless conduct alleged herein and that

would effectively deter similar conduct in the future;

(6)     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 15 U.S.C. §

1691e(d), 42 U.S.C. § 1988(b), and Va. Code Ann. § 59.1-204(B);

(7)     Award prejudgment interest to Plaintiffs; and

(8)     Order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Plaintiffs request trial by jury as to all issues in this case.

Respectfully submitted,

John P. Relman (D.C. Bar No. 405500)
Glenn Schlactus (D.C. Bar No. 475950)
RELMAN, DANE & COLFAX PLLC
1225 19th Street, N.W.
Suite 600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (fax)

*Attorneys for Plaintiffs*

Dated:  August 3, 2011