# EXHIBIT

# 7

A portion of this document has been redacted pursuant to the Stipulated Protective Order (Docket No. 66) (Aug. 30, 2012), ¶ 6.  An unredacted version has been filed under seal.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARY MORGAN, et al.,
on behalf of themselves and
all other similarly situated,
                    Plaintiffs,
vs.                    Civil Action No.
                    3:12cv373-JAG

RICHMOND SCHOOL OF HEALTH
AND TECHNOLOGY, INC.,

                    Defendant.

DEPOSITION OF LA-DEVA DABNEY

September 19, 2012
1:00 p.m.

Taken at:

BRENNER, EVANS & MILLMAN, P.C.
411 East Franklin Street, Suite 200
Richmond, Virginia  23219

REPORTED BY:  Lisa M. Blair, RPR
COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia  23233
804.359.1984

Page 2

1   APPEARANCES:
2   Megan Cacace, Esquire
    Stephen F. Hayes, Esquire
3   RELMAN, DANE & COLFAX PLLC
    1225 19th Street NW
4   Suite 600
    Washington DC  20036
5   202-728-1888
    Counsel for the Plaintiffs
6
7   Alexander S. deWitt, Esquire
    BRENNER, EVANS & MILLMAN, P.C.
8   411 East Franklin Street, Suite 200
    Richmond, Virginia 23219-0470
9   804-644-1300
    Counsel for the Defendant
10
11
12  ALSO PRESENT:
13  Miriam Becker-Cohen, Paralegal
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

I N D E X

LA-DEVA DABNEY                    PAGE
  By Mr. deWitt                   4, 122
  By Ms. Cacace                   118

E X H I B I T S

EXHIBITS                         PAGE

208   RSHT0007729 TO 7730          24

209   RSHT0021805 TO 21806         33

210   RSHT0007731                  40

211   RSHT0007844 TO 7845          42

212   RSHT0007823                  46

213   RSHT0007917 TO 7918          46

214   RSHT0007919 TO 7920          50

215   RSHT0007891                  51

216   RSHT0007896                  51

217   RSHT0007894                  52

218   RSHT0007763                  66

219   RSHT0007772 to 7773          76

220   RSHT0007945                  102

Page 4

1        LA-DEVA DABNEY, a Plaintiff, called
2   by the Defendant, first being duly sworn, testified as
3   follows:
4
5        EXAMINATION BY MR. DEWITT:
6
7        Q.   Ms. Dabney, good afternoon.
8        A.   Good afternoon.
9        Q.   My name is Alex deWitt.  I'm an attorney.
10   I represent Richmond School of Health and Technology,
11   Inc. in a lawsuit brought by Mary Morgan, yourself,
12   and six other plaintiffs in the U.S. District Court
13   for the Eastern District of Virginia, Richmond
14   Division.  And we're here to take your deposition this
15   afternoon.
16        Have you given deposition testimony
17   before?
18        A.   No.
19        Q.   I'm going to ask you a series of
20   questions this afternoon relating to the lawsuit, and
21   you're going to be expected to answer the questions as
22   best you can.
23        A.   Okay.
24        Q.   If any of my questions are unclear,
25   please let me know, and I'm happy to rephrase.

Electronically signed by Lisa Blair (501-025-348-9548)                    ab9eac14-acd2-4352-a9f2-70974067624c

Page 29

1  Systems, Inc.?
2      A.   Yes.
3      Q.   Okay.
4      A.   But that's what they -- if you look up
5  the job, it's called logistic analyst.  But when you
6  actually get into the job, you're a contract
7  administrative specialist.  You're working on the
8  contracts, looking for all the equipment.
9      Q.   Do you know when you drafted this resumé
10  that's been marked Exhibit 208?
11      A.   I'm not sure of the date, but if I was
12  already working here, I was -- I started off as a
13  LOG I.  So this might have been me applying for the
14  LOG III job to get the higher pay.
15      Q.   I see.  Within your --
16      A.   Yes.
17      Q.   So you were applying for another position
18  at Regent Systems, Inc.?
19      A.   Yes.
20      Q.   Basically moving up the ladder?
21      A.   Yes, sir.
22      Q.   How did you learn about RSHT?
23      A.   Television, and it's a newspaper that
24  come out.  I'm not sure what it is.  It came out
25  through Progress Index, a little scribble on the

Page 30

1  bottom of Progress Index, like a little ad printed on
2  the bottom of the newspaper.
3      Q.   Which newspaper?
4      A.   Progress Index.
5      Q.   I'm sorry; I didn't understand.
6      A.   That's okay.
7      Q.   Progress Index?
8      A.   Yes.  That's the Petersburg newspaper.
9      Q.   Okay.
10      A.   And they also had a commercial.
11      Q.   A television commercial?
12      A.   Yes, sir.
13      Q.   Which television station?
14      A.   I don't recall it at this time.
15      Q.   And do you remember anything about the
16  television commercial?
17      A.   They showed people, you know, in the
18  classroom setting, you know, I guess somebody -- I
19  want to say standing over top of them teaching.  Just,
20  you know -- and it had like a little theme to it that
21  would kind of catch your attention.
22      Q.   Did it catch your attention?
23      A.   Yes, it did.  I went to RSHT.
24      Q.   Where were you living at the time?
25      A.   I was living in Petersburg with my

Page 31

1  parents.
2      Q.   Okay.  Is that the Ramblewood Road
3  address?
4      A.   Yes.
5      Q.   I should ask you:  Where do you live now?
6      A.   I live in Ashland, Virginia.
7      Q.   What's your address?
8      A.   █████████████████████████
   █████████████████████████
10      Q.   Have you lived anywhere else in between
11  the Ramblewood Road and the Swannee Drive?
12      A.   Yes.  I've lived two places.
13      Q.   Okay.  Can you just tell me?
14      A.   Yes.  Stedman Drive -- actually, three
15  places.
16      Q.   Where is Stedman Drive?
17      A.   That's in Petersburg.
18      Q.   So you went from Ramblewood to Stedman?
19      A.   Stedman, yes.
20      Q.   Okay.  And where next?
21      A.   Then I got married and moved to
22  Glen Allen.
23      Q.   Okay.
24      A.   I think it's 9300 Center Way Drive.  And
25  then I moved to 10261-G Lakeridge Square Court.

Page 32

1      Q.   Where is that?
2      A.   That's in Ashland.
3      Q.   All right.  So you saw a newspaper -- how
4  did you describe it again?
5      A.   An ad at the bottom of the page, at the
6  bottom of the newspaper.
7      Q.   And did it have a phone number?
8      A.   Yes.
9      Q.   And you saw a television commercial?
10      A.   Yes.
11      Q.   Do you know -- what did you do next when
12  you saw these ads?
13      MS. CACACE:  Objection to form; vague.  You
14  can answer, if you understand.
15      A.   If you mean going to the school, that was
16  my next step.
17      Q.   All right.  Well, that was -- I should
18  ask it a little more specifically.  Did you do any --
19  after seeing the commercial and looking at the
20  Progress Index, did you do any research regarding --
21      A.   No.
22      Q.   -- RSHT?
23      A.   I didn't.
24      Q.   Did you know anyone who was attending
25  RSHT?

Electronically signed by Lisa Blair (501-025-348-9548)                                   ab9eac14-acd2-4352-a9f2-70974067624c

Page 33

```
 1      A.   No.
 2      Q.   Did you use the phone number and call
 3   RSHT?
 4      A.   Yes.
 5      Q.   Do you know which campus you called?
 6      A.   At the time, the only campus was Chester
 7   that I knew of.
 8      Q.   Okay.  Can you recall for me that phone
 9   call to Chester?  Do you remember the conversation you
10   had with whoever answered the phone?
11      A.   I think I just called to set up -- asked
12   when could I come in and where they were located, so I
13   could get there.  And they told me they were by
14   Virginia Trucking, and that's how I found them.
15      Q.   That was basically the conversation?
16      A.   Yes.
17           (Exhibit Number 209 was marked for
18   identification).
19      Q.   Ms. Dabney, I'm going to show you Exhibit
20   209.  Do you recognize this document?
21      A.   Yes.
22      Q.   Is this your application for admission to
23   RSHT?
24      A.   Yes.
25      Q.   At the bottom, is it signed and dated by
```

Page 34

```
 1   you?
 2      A.   Yes.
 3      Q.   And I show you this document.  I'm trying
 4   to understand the date that you went into RSHT
 5   initially.  Was it May 3, 2006?
 6      A.   Must be.
 7      Q.   All right.  What time was your
 8   appointment on May 3, 2006?
 9      A.   That I don't remember.
10      Q.   And do you remember who you first met
11   with?
12      A.   Dr. Brown.
13      Q.   And do you remember what Dr. Brown's
14   position was at RSHT?
15      A.   I think he was the dean.
16      Q.   And he was the first person that you met
17   with when you went to the Chester campus?
18      A.   Yes; that I recall, yes.
19      Q.   And can you tell me -- recall for me your
20   conversation with Dr. Brown?
21      A.   Dr. Brown was -- he explained about the
22   school, about -- you know, I told him what I was
23   interested in.  He told me that they had it.  Then he,
24   you know, talked about how the school was -- you know,
25   how good it was.  And then I think the next thing he
```

Page 35

```
 1   did was set me an appointment up with the person --
 2   administrator who could get me registered for classes.
 3      Q.   An appointment to come back on another
 4   day?
 5      A.   I think so.
 6      Q.   Did you fill in any paperwork during your
 7   meeting with Dr. Brown?
 8      A.   I don't remember, but apparently this
 9   must have been one of them.  So I really don't know if
10   I filled out anything else.
11      Q.   That's what I'm trying to get a sense of.
12   Do you know whether you filled in this application
13   for admission when you met with Dr. Brown or at some
14   subsequent visit to the Chester campus?
15      A.   I want to say with Dr. Brown, but it
16   could have been later.  I really don't recall.  It's
17   been a long time.
18      Q.   That's what I'm trying to get to, to
19   understand what you recall.
20      A.   Yes, sir.
21      Q.   Do you recall anything that Dr. Brown
22   told you specifically regarding the medical billing
23   and coding program?
24      A.   No.
25      Q.   Do you recall having any specific
```

Page 36

```
 1   questions for Dr. Brown about the medical billing and
 2   coding program?
 3      A.   I know one of my questions was mainly
 4   evening, because I worked, and I needed the evening,
 5   and on-the-job training.  I think I asked about
 6   on-the-job training.
 7      Q.   And do you recall what his -- what he
 8   told you about on-the-job training?
 9      A.   That we were going out for the -- when
10   you do everything, and once it was completed, you went
11   out for your internship -- or externship, as some
12   people call it.
13      Q.   So you-all had a general conversation
14   about externships?
15      A.   Yes.
16      Q.   Did he give you any specifics regarding
17   the externships?
18           MS. CACACE:  Objection.
19      A.   Everything else I would find out through
20   whoever was going to register me.
21           MS. CACACE:  If you could just pause for
22   just a second after he asks the question to give me a
23   chance to object.  Sometimes I will.
24      Q.   I'm going to show you an RSHT training
25   center school catalog.  I'll show your counsel first.
```

9 (Pages 33 to 36)

Page 37

1    There is a handwritten date on the bottom of the front
2    page, 3-06. And just ask you: Does this look
3    familiar?
4         A.    Kind of sort of. Not all of this here.
5    I don't remember all this being on the front of it.
6         Q.    All right.
7         A.    But at that time the only one -- the only
8    school was this one right here that I knew of. I
9    don't know anything about this one. This is the only
10   thing that I know that was on the front. This is a
11   little different than the one I had.
12        Q.    Just for the record, you're indicating
13   you didn't know anything about --
14        A.    Willow Lawn, no.
15        Q.    -- the main campus on Willow Lawn Drive?
16        A.    No, I didn't.
17        Q.    Or the branch campus in Charlottesville?
18        A.    No, I didn't.
19        Q.    And just for the rest of the deposition
20   today, today you have no knowledge regarding the
21   program on the main campus of Willow Lawn Drive,
22   correct?
23        A.    No, I don't.
24        Q.    And the same thing with respect to the
25   branch campus in Charlottesville?

Page 38

1         A.    I don't know anything about those, no.
2         Q.    Do you recall if, during your initial
3    meeting with Dr. Brown, whether he gave you either a
4    school catalog or a school handbook?
5         A.    I don't know if he gave it to me, but I
6    did end up with one.
7         Q.    All right. Do you have a copy of that
8    today?
9         A.    Not with me.
10        Q.    At home?
11        A.    Yes.
12        Q.    Is the catalog or handbook that you have
13   in your possession, is it a smaller handbook like this
14   one?
15             MS. CACACE: Object to the form; vague. You
16   can answer if you understand.
17        Q.    Or do you have something like an 8
18   and-a-half by 11 pamphlet?
19        A.    And folded in half like this; that's what
20   I have.
21        Q.    All right. I'm not going to make this an
22   exhibit. I'll show you your counsel. For the record, a
23   photocopy of the school catalog that Ms. Dabney just
24   reviewed is Bates numbered RSHT22211 through
25   RSHT22245.

Page 39

1         All right. When you met with Dr. Brown,
2    the first visit that we're discussing at Chester, did
3    he take you for a tour of the campus?
4         A.    Yes, I did a tour of the campus.
5         Q.    Did you tour the campus with Dr. Brown?
6         A.    Yes.
7         Q.    And do you remember anything about that
8    tour?
9             MS. CACACE: Objection to form; vague. You
10   can answer, if you understand.
11        A.    I just know the building. I mean, I know
12   that like the back of my hand. That's all I remember.
13        Q.    As Dr. Brown took you for a tour, do you
14   remember having questions for Dr. Brown, or him
15   telling you anything about the program?
16        A.    Well, the program we talked about before.
17   The two of us just toured the building.
18        Q.    While you toured the building, did you
19   talk to any instructors or students?
20        A.    I didn't see any at the time.
21        Q.    And when you were done with the tour, did
22   that conclude your meeting with Dr. Brown?
23        A.    Yes, I do believe so.
24        Q.    How long was it before you had the second
25   meeting? I'm just trying to understand approximately

Page 40

1    how long it was before you came back?
2         A.    I don't think it was that long. I really
3    don't remember. I don't know if it was the next day
4    or the next week, but I did come back.
5         Q.    And tell me about your meeting when you
6    came back. Who did you meet with?
7         A.    I don't know the name, but it was a young
8    lady, a female. And we met, talked about the school
9    more, and started the application, I believe.
10        Q.    The application you're referring to, is
11   that Exhibit 209?
12        A.    Whatever else I needed to fill out to get
13   started for school.
14             (Exhibit Number 210 was marked for
15   identification.)
16        Q.    I'll show you a document marked
17   Exhibit 210. Do you recognize this document?
18        A.    I don't remember it, but it's my
19   information.
20        Q.    On the bottom of the first page, is that
21   your signature?
22        A.    I think -- I'm not too sure about the --
23   the "La-Deva" is mine.
24        Q.    The second page, the initials, are those
25   your initials?

Page 65

1 tell you his background?
2    A.   I think he worked for a bank or a
3 financial...
4    Q.   And what level Math were you taking in
5 this course?
6    A.   That was -- I want to say it was a
7 business Math.
8    Q.   And was that the name of your textbook,
9 business Math?
10    A.   I don't recall the name of the textbook.
11    Q.   Did you have a textbook?
12    A.   Yes.
13    Q.   And do you know whether that was the 2006
14 edition of the textbook?
15    A.   I don't know.
16    Q.   And like the other courses, did you have
17 homework?
18    A.   Yes.
19    Q.   Take-home assignments?
20    A.   Yes.
21    Q.   Tests?
22    A.   Yes.
23    Q.   And a final exam?
24    A.   Yes.
25    Q.   Did you have a workbook for Math?

Page 66

1    A.   Yes, we did have a workbook.
2    Q.   And do you remember having any specific
3 questions for your Math instructor?
4    MS. CACACE:  Objection to form; vague.  You
5 can answer.
6    A.   Just whenever you had a Math question,
7 whenever there was something you didn't understand,
8 then he would answer.
9    Q.   And English and Math, you don't recall
10 today which module they fell in?
11    A.   No.
12    Q.   Do you recall any specific class that you
13 took in the second module?
14    A.   I don't.  I don't know what order they
15 were in, what we took together.  I just know we
16 rotated on around until, you know...
17    Q.   You mentioned your conversation with
18 Dr. Brown about externships.  Did you have an
19 externship in 2006 while you were at RSHT?
20    A.   No, I didn't.
21    (Exhibit Number 218 was marked for
22 identification.)
23    Q.   I'll show you the next document.
24    A.   (Witness reviewing document).
25    Q.   Do you recognize this document?

Page 67

1    A.   I don't recognize it.  I haven't seen it.
2    Q.   Okay.  Does it bear your signature and
3 date on the second page?
4    A.   That is my signature.
5    Q.   It's a student externship agreement dated
6 7-12-07, correct?
7    A.   Yes, it is.
8    Q.   Had you participated in an externship as
9 of 7-12-2007?
10    A.   No, I did not.
11    Q.   Did you participate in an externship
12 after 7-12-07?
13    A.   No, I did not.
14    Q.   Did you talk with anyone at RSHT about
15 participating in an externship?
16    A.   Yes, we did.  Yes, I did.
17    Q.   You did.  Who did you talk to?
18    A.   I don't know the name, but it's the
19 person who was responsible for getting us the
20 externship.  I don't know what her name was, but the
21 office that was responsible for doing it.
22    Q.   All right.  And recall that conversation
23 for me, please.
24    A.   Just that on a daily basis we asked them
25 when we were going to go and do our externship, and

Page 68

1 they couldn't find anything.
2    Q.   And just so I'm clear, when you say "we,"
3 you actually mean --
4    A.   Students.  Actual students.  It was time
5 for the externship to start.
6    Q.   Did you have a sitdown meeting with
7 anyone at RSHT about externships?
8    MS. CACACE:  Objection to form; vague, time
9 period.  You can answer.
10    A.   Not that I know of, no.
11    Q.   Did you personally talk to anyone at RSHT
12 about an externship?
13    A.   The person who was responsible for
14 trying -- I don't know her name -- trying to get us
15 out to do our externship, which this is what we were
16 supposed to do before we took our exam.
17    Q.   All right.  And do you remember what she
18 told you when you personally went to her and asked her
19 about this?
20    MS. CACACE:  Objection; assumes facts not in
21 evidence.  You can answer.
22    A.   That they were looking for an externship.
23    Q.   Did you personally go to somebody and ask
24 them about an externship?
25    A.   The person who was responsible in the

Electronically signed by Lisa Blair (501-025-348-9548)                                    ab9eac14-acd2-4352-a9f2-70974067624c

Page 69

1  office to get the externships -- am I answering your
2  question incorrectly?
3      Q.   Did you pick up the phone and call
4  somebody?  Or while you were at the campus, did you go
5  and meet with somebody?
6      A.   While I was at the campus, you go to the
7  office and talk to them.
8      Q.   And when you went to the office, you
9  talked to a lady?
10     A.   Yes.
11     Q.   You just don't know what her name is?
12     A.   No, I don't.
13     Q.   And I'm trying to -- to the extent you
14  can recall -- understand what that conversation was.
15     A.   The conversation I can recall was asking
16  her on a daily basis when were we going to go do our
17  externship, and her saying that she hadn't found us
18  one yet.
19     Q.   And you say "a daily basis."  How many
20  days did you go and meet with this lady?
21     A.   Basically five days a week when it was on
22  the class, I would ask her.
23     Q.   And approximately what time period?
24     A.   We get in school about 5.  So about 5 --
25  not 5; 6.  School started at 6.  So they were still

Page 70

1  there at 6.
2      Q.   The agreement that you signed is dated
3  July 12, 2007?
4      A.   Uh-huh (affirmative).
5      Q.   Were you going and talking to this lady
6  in July 2007 about placement for an externship?
7      A.   This must have been a form that was
8  signed afterwards.
9      Q.   All right.  I'm just trying to get a
10  sense of time.
11     A.   I mean, after I went -- because I was
12  already working somewhere else at the time.  So I must
13  have gone back to see her again, and we filled out the
14  paperwork.  Still trying to get an externship at that
15  time, because I was still interested.
16     Q.   And each time you spoke to this lady, she
17  told you she was still looking for an externship?
18     A.   Yes, she was.
19     Q.   Did she tell you where?
20     A.   No, she didn't.
21     Q.   Did you ask her where?
22     A.   No, I didn't.
23     Q.   How many times total did you talk to this
24  lady about finding an externship?
25     A.   I can say 100 times, because that's what

Page 71

1  it seemed like, 100 times.  You know, every day asking
2  her:  Do you have anything for us?  When are we going?
3  When am I going to go?  When do we get to do
4  externship?
5      Q.   You mentioned earlier "we."  Were there
6  other classmates waiting for an externship?
7      A.   There were three of us at that time that
8  had finished that mod that were waiting.
9      Q.   And who were the three?  Can you give the
10  other names?
11     A.   Judy Barry was one, and I do not recall
12  the other young lady -- Lindsey.
13     Q.   Judy Barry, did they find an externship
14  for Judy Barry?
15     A.   No.
16     Q.   What about for Lindsey?
17     A.   No.
18     Q.   Do you know whether other students in
19  your class, the MBC class, had externships?
20     A.   I know of one.
21     Q.   Okay.  Who had an externship?
22     A.   Elizabeth Wilson.
23     Q.   And do you know where she did her
24  externship?
25     A.   I don't know.

Page 72

1      Q.   You just know that she had one?
2      A.   Yes.
3      Q.   Anyone else?
4      A.   Not that I know of, no.
5      Q.   Was there any type of resolution that you
6  reached with RSHT regarding the externship?
7          MS. CACACE:  Objection to form; vague.  You
8  can answer, if you understand.
9      A.   Resolution as to?
10     Q.   Well, did they have you -- I think your
11  testimony is you never did an externship?
12     A.   I didn't.
13     Q.   Well, did you do something to substitute
14  for that requirement?
15     A.   I don't know if you want to call it
16  substitution, but I sat in the library and did all the
17  books in the library until the mod was over, until it
18  was time for the class to end.
19     Q.   When you did a book, what are you talking
20  about?
21     A.   There was a book they had.  And inside
22  the book there were situations, and you would do the
23  situations, and figure it out, and put the information
24  in the computer.
25     Q.   What type of situations?

Electronically signed by Lisa Blair (501-025-348-9548)                                    ab9eac14-acd2-4352-a9f2-70974067624c

Page 117

1  be to the rest of the proposed class?
2      MS. CACACE:  Objection; calls for a legal
3  conclusion.  The witness is not here to testify as to
4  what her legal obligations would be.  You can answer.
5      A.   I'm not quite sure I understand.
6      Q.   Do you know who the proposed class is?
7      MS. CACACE:  Objection; calls for a legal
8  conclusion.  You can answer, if you can.
9      Q.   Or do you know what members -- which
10 people would be included in the proposed class?
11     MS. CACACE:  Same objection.  You can
12 answer, if you can.
13     A.   I can't.  I can't give you those names.
14 I can't.
15     Q.   I understand your counsel's objections.
16 I want to know if you have any understanding regarding
17 your responsibilities as a plaintiff in a class action
18 suit?
19     MS. CACACE:  Same objection.  You can
20 answer, if you can.
21     A.   To tell the truth.
22     Q.   Well, beyond that, do you have an
23 understanding of your responsibilities in a class
24 action suit?
25     MS. CACACE:  Same objection.

Page 118

1      A.   I would assume the same thing, to tell
2  the truth as to what I'm claiming.
3      Q.   Anything else?
4      MS. CACACE:  Same objection.
5      A.   I can't think of --
6      MS. CACACE:  Asked and answered.
7      Q.   Sorry.  You can answer.
8      A.   I can't think of anything.
9      MR. DEWITT:  Okay.  Ms. Dabney, thank you
10 very much for your time.
11     MS. CACACE:  I just have a couple.
12     MR. DEWITT:  Your lawyer has some followup
13 for you.
14     MS. CACACE:  Can I just have one minute to
15 collect myself?
16     MR. DEWITT:  Yes.
17         (Whereupon, a recess was taken).
18
19         EXAMINATION BY MS. CACACE:
20
21     Q.   Just a couple of quick things to clarify.
22 When you were testifying earlier about the book you
23 used during the time that you were a student at
24 RSHT, the IC-9 [sic], or something like that, coding
25 book?  What is it?

Page 119

1      A.   ICD-9.
2      Q.   ICD-9.  Okay.  And that was a book that
3  was provided to you by RSHT?
4      A.   Yes.
5      Q.   The book that you were given, was it the
6  current version of the book, or was it out of date?
7      A.   It was out of date.
8      Q.   And did the -- the fact that the book was
9  out of date, did that make it more difficult for you?
10     A.   Yes.  To use the system that they had us
11 coding in, in the computer, yes, it wouldn't accept
12 those codes.
13     Q.   And do you recall being asked questions
14 about a certification or licensing test that you took?
15     A.   Yes.
16     Q.   Could the name of the test have been
17 NCCT, the licensing -- the entity that you took the
18 test from?
19     A.   Yes.
20     Q.   And that stands for National Center for
21 Competency Testing; does that sound right?
22     A.   Yes.
23     MR. DEWITT:  Let me just note an objection.
24 The question was "could it have been."  So to the
25 extent it calls for speculation.  Go ahead.

Page 120

1      Q.   Do you know one way or the other whether
2  the license you received and the test you took was
3  from the National Center for Competency Testing?
4      A.   Yes, that's it.
5      Q.   Do you recall, did RSHT make
6  representations to you about the amount of money you'd
7  be able to earn after completing the program?
8      A.   Yes.
9      Q.   In positions -- medical billing and
10 coding positions?
11     A.   Yes.
12     Q.   And did you rely on those representations
13 in deciding to attend RSHT?
14     MR. DEWITT:  I'll object; improper
15 foundation.  Go ahead.
16     Q.   Did RSHT make representations to you --
17 sorry.  I'm not sure if you answered that.  Did you
18 rely on those representations with regard to earnings
19 in deciding to attend RSHT?
20     A.   Yes, I did.
21     Q.   And did RSHT make representations to you
22 about job placement services that they would provide
23 to you?
24     A.   Yes, they did.
25     Q.   And did you rely on those representations

Electronically signed by Lisa Blair (501-025-348-9548)                    ab9eac14-acd2-4352-a9f2-70974067624c

Page 121

1    in deciding to attend RSHT?
2        A.   Yes, I did.
3        Q.   And did RSHT live up to those promises or
4    not?
5        A.   No, they didn't.
6        Q.   And did RSHT make representations to you
7    about whether you would be placed in an externship as
8    part of the program?
9        A.   Yes, they did.
10       Q.   And did you rely on those representations
11   in deciding to attend RSHT?
12       A.   Yes, I did.
13       Q.   And did RSHT live up to those promises
14   with regard to the internship?
15       A.   No, they did not.
16           MR. DEWITT:  I'll just note an objection to
17   the extent these questions call for a legal
18   conclusion.  I just wanted to note that.
19       Q.   And you indicated earlier that if you had
20   received from RSHT what was promised, you'd be working
21   where you want to be, and you're not; do you recall
22   that testimony?
23       A.   Yes, I do.
24       Q.   And when you indicated that you would be
25   working where you want to be, is that the position in

Page 122

1    medical billing and coding?
2        A.   Yes.
3        Q.   And I take it you would prefer to be in
4    medical billing and coding over the current position
5    you have in the government?
6        A.   Yes, I would.
7            MS. CACACE:  No further questions.
8
9            FURTHER EXAMINATION BY MR. DEWITT:
10
11       Q.   Ms. Dabney, I thought I understood you to
12   describe to me that your current position with the
13   government was a position that you intend to keep --
14       A.   I do.
15       Q.   -- until you retire?
16       A.   I do intend to keep it.  It's not where I
17   want to be, but it's where -- I do intend to keep it.
18   I'm 47.  It's too late to start all over getting ready
19   for retirement.
20       Q.   If a doctor's office in the private
21   sector were to offer you an MBC position that pays
22   less, is it your testimony that you would accept a
23   smaller salary in a private sector job over your
24   current job with the government?
25       A.   That's not what I said.

Page 123

1        Q.   Would you?
2        A.   No, I wouldn't.
3            MR. DEWITT:  That's all I have.
4            MS. CACACE:  She'll read and sign.
5
6       AND FURTHER THIS DEPONENT SAITH NOT
7        (The deposition concluded at 3:57 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 124

1    COMMONWEALTH OF VIRGINIA,
2    CITY OF RICHMOND, to wit:
3
4            I, Lisa M. Blair, a Notary Public
5    for the State of Virginia at Large, do hereby certify
6    that the foregoing deposition of LA-DEVA DABNEY was
7    duly sworn to before me at the time and place set out
8    in the caption hereto.
9            Further, that the transcript of
10   the deposition is true and correct, and that there
11   were 13 exhibits (Numbered 208 to 220) filed with me
12   during the taking hereof.
13           Given under my hand this 25th
14   day of September, 2012.
15
16                        _____
17                        Lisa M. Blair, RPR
                          Notary Public for the
18                        State of Virginia at Large
19
20   My Commission expires:
     October 31, 2016
21   Notary registration #:  253150
22
23
24
25

Electronically signed by Lisa Blair (501-025-348-9548)                                    ab9eac14-acd2-4352-a9f2-70974067624c

# DABNEY DEPOSITION

# EXHIBIT 209



**RSHT**
751 West Hundred Road, ̃ 10
Chester, VA 23836
(804) 751-9191 FAX (804) 751-2599

| OFFICE USE ONLY |
| --- |
| Start Date_____ |
| Adm Code_____ |

### Application for Admission

I hereby apply for enrollment in accordance with the terms and regulations of RSHT. I acknowledge that I am responsible for an application fee of **$75.00** for all programs. I understand that this fee is non-refundable.

Name _LA-Devia M.K.ta Wooden_



Applicant's Signature

53.06
Date

RSHTWOODEN,L0003

EXHIBIT
209
979-12LB

Form 102   MHS 3/19/06

RSHT0002795

# DABNEY DEPOSITION

# EXHIBIT 210

# RSHT
## ENROLLMENT AGREEMENT

☐ Main Campus:
1601 Willow Lawn Drive, Suite 320
Richmond, VA 23230

☑ Branch Campus:
751 West Hundred Road
Chester, VA 23836

Branch Campus: ☐
702 Chariton Avenue, Suite A
Charlottesville, VA  22902

Name: _LA-DEVA          Woaden_          SSN: ▮▮▮▮▮▮▮
First            MI            Last

Address: ▮▮▮▮▮▮▮            Birth date: ▮▮▮▮▮▮▮

City _PETERSbuRg_          State _VA_          Zip Code: _23805_

Telephone ▮▮▮▮▮▮▮          Email _____

As the above-named applicant, I hereby agree to be enrolled in the _Medical Billing & Coding_
program which is _30_ weeks of instructional time.  Classes are scheduled to begin on _May 15, 2006_
and end on _12/14/06_.  Classes meet _MTWTh_ from _530_ to _930_.

Total tuition of $ _8500.00_, a non-refundable application fee of $ _75.00_.  Should I have to repeat
a course, I will be charged a _per credit hour_ fee of $ _354.00_.  I hereby acknowledge payment of a deposit of
$ _75.00_, leaving a balance due to the institution of $ _8500.00_.

I hereby agree to all provisions of this Enrollment Agreement, and understand that I have agreed to accept a place
in the class described above and agree to pay to RSHT all fees according to the terms and conditions contained
herein.  Furthermore, I acknowledge that I have read, fully understand, and received a copy of this agreement.

I understand that this agreement becomes a legally binding instrument upon the school's written acceptance of my
application, unless cancelled by me pursuant to the refund policy contained within this agreement.

Student Signature: _LaDeun M Woll._          Date: _5/3/06_

Grantor's Signature: _____          Date: _5/3/06_

**Note:  Please read and initial the statements on the back of this sheet.**



EXHIBIT
210
4-19-12 CB

Form # 316/RSHT    Revised 3/3/2006

**Attendance:**

Attendance is required at all scheduled classes. If in an emergency an absence becomes necessary, the student must notify the school prior to the beginning of the schedule class. Students with seven consecutive absences or total absences exceeding 25% of their scheduled classes will be withdrawn from the program. Refer to the School Catalog and Student Handbook for further details.

Initials _____ℓMƱ_____

**Cancellation and Refund Policy:**

If an applicant cancels this agreement no later than the third business day after the date of this agreement, a full refund will be made minus the non-refundable application fee. The application fee for all programs is $75.00. If a class is cancelled by the school, all monies will be refunded.

All students will be charged a non-refundable application fee in addition to the tuition charges as specified below. The portion of the program completed will be determined by the number of weeks attended. Any portion of a week's attendance will be considered a full week for the purpose of the refund calculation.

1. If a student does not begin classes, no more than $100.00 of the tuition paid will be retained by the school.

2. A student who enters school but withdraws prior to completing the first 25% of the period charged will be assessed 50% of the tuition charges for the period.

3. A student, who withdraws after completing the first 25%, but prior to completing 50% of the period charged, will be assessed 75% of the tuition charges for the period.

4. A student who withdraws after completing half, or more than half, of the period charged is assessed 100% of the tuition charges for the period.

Refunds are made within 30 days of the cancellation date or date of withdrawal.

Initials _____ℓMƱ_____

**Standards:**

Students are required to abide by the proper standards for dress and conduct while in attendance at all classes and externship training. Profanity, disorderly conduct, or other action which, in the opinion of the school is disruptive, will not be tolerated and will be grounds for dismissal for the program.

Initials _____ℓMƱ_____

**Placement:**

Each graduate may avail him or herself of the school's job placement assistance program. RSHT DOES NOT GUARANTEE EMPLOYMENT. However, every effort will be made to assist the graduate in obtaining employment. There is no charge for this service.

Initials _____ℓMƱ_____

RSHT reserves the right to make changes to the program start date, content, schedule, and/or training hours as deemed necessary.

Initials _____ℓMƱ_____

**Conditions of Agreement:**

This constitutes the entire agreement between the applicant and the school, and no other promise or agreement, expressed or implied, has been made either orally or in writing. Should the student fail to meet the terms of his/her financial obligations contained in this agreement, the school reserves the right to add to this agreement a reasonable amount for collection costs incurred including, but not limited to, collection agency fees, attorney fees of 33.3%, court costs, etc.

Initials _____ℓMƱ_____

Form # 316/RSHT     Revised 3/3/2006

# DABNEY DEPOSITION

# EXHIBIT 212

## Cost of Attendance Worksheet

### RSHT – Main Campus – Chester

Date: 5/4/06

Student's Name: Wooden _____ LaDena _____ _____
                Last        First         Middle

Social Security: █████████████

Academic Year: _____ 05-06 _____



_____C Anderson_____     5/4/06
Financial Aid Officer    Date



EXHIBIT
212
4-19-12 LB

Form 404  mhs 3/27/06

# DABNEY DEPOSITION

# EXHIBIT 213



EFC 980

## TUITION WORKSHEET

Student Name: _La Teva Wooden_   Social Security Number: ███████

Program: _MBC/PM_   Start Date: _5/15/06_

REDACTED

Student Signature: _Latera WdL_

Date: _3/4/06_

Financing Department Signature: _C Anderson_

Date: _5/4/06_



**EXHIBIT**
213
4-14-12LB

Form 416 11/30/05

RSHTWOODEN,L0104                                    RSHT0002896

# DABNEY DEPOSITION

# EXHIBIT 216

NAME (Print) La-Dera Wooden          PROGRAM/START DATE 5·16·06

## RSHT –Chester - ENROLLMENT CERTIFICATION

Please read each of the following statements and initial in the space provided to the right of each statement. Please do not hesitate to ask questions.

1. Students are required to maintain satisfactory academic progress in accordance with the Academic Information in the *Catalog*. I understand that homework/outside class preparation is required. *LMW*

2. Financial Aid is available to eligible students upon completion, submission, and processing of a financial aid application. Please note that, in most cases, student financial aid awards include loans. Be sure you know your rights and responsibilities (see *Catalog*, Financial Aid information). *LMW*

3. Tuition payments are to be made as scheduled.  Tuition charges for early withdrawal are calculated in accordance with RSHT's refund policy (see *Catalog*, Enrollment Agreement – Cancellation and Refund Policy). *LMW*

4. The criteria for graduation is outlined in the Catalog and includes high school/GED completion documentation, attendance, financial, and meeting academic progress requirements (See *Catalog*, Requirements for Graduation).  Graduates seeking job placement assistance must qualify for such assistance as outlined in the Catalog (see Job Placement Assistance). Graduate surveys demonstrate that an average of 86.5 of 2003-2004 academic year graduates are employed in training-related positions. *LMW*

5. The graduation rate for students entering college for the first time in the fall of 2002 and seeking a degree or diploma for the first was 60.4% Students should make every effort to regularly attend class, complete make-up work when absent, and actively seek advice should problems arise that may adversely affect program completion (see *Catalog*, Makeup/Incomplete and Counseling Services). *LMW*

6. Graduate salaries vary and are affected by job location, graduate experience, and class standing. In a survey of Main Campus 2003-2004 academic year graduates available for placement, the approximate average entry-level starting salaries for individuals without prior experience in these training areas were:

| Program Area | Entry-Level Wages |
| --- | --- |
| Practical Nursing | $30,202 per year |
| Medical Assistant | $19,365 per year |
| Pharmacy Technician | $17,930 per year |

7. Students are to park ONLY in designated areas. Receipt of student parking instructions is acknowledged.  Violators of RSHT's parking policy are subject to probation, suspension, or dismissal. *LMW*

8. I understand that Clinical and Externship hours are scheduled according to site requirements; which may not coincide with my class schedule. *LMW*

9. Any class failed by a student must be repeated. A class may not be repeated more than once without approval of the Director. There is a charge per credit hour for all repeats. *LMW*

10. Students who withdraw and subsequently re-enter are subjected to policies in effect at the time of their re-entry. *LMW*



EXHIBIT
216
4-19-12 CB

Form 207 CHS ha 11/29/05

RSHTWOODEN,L0020

RSHT0002812



11. All students must complete their program within 150% of the normal time frame.

12. A student's enrollment will be terminated for excessive absences which result in unsatisfactory academic progress in a class or if such absences are determined to be without sufficient reason. State regulations require any student who misses seven (7) consecutive days to be withdrawn from the program. Students with excessive absences may have their records reviewed by the School Director (see *Catalog*, Attendance/Appeal).

13. RSHT reserves the right to terminate a student's enrollment on the following grounds: nonconformity with RSHT policy and regulations including parking; unsatisfactory progress; unsatisfactory attendance; nonpayment of tuition; security violations; possession or use on campus of any drugs or alcohol; conduct damaging to facilities; or disruption of academic processes (see *Catalog*, Dismissal from School).

14. The honor System at RSHT is bases on individual integrity. This system assumes that every student will accept his or her role in the academic community with a feeling of self respect and duty. I pledge to support the Honor System or RSHT. I will neither give nor receive aid on any assignment. I will report any violations of this honor code to an instructor or director. **I certify that I have read the Honor Code and that I will abide by its intent.**

15. RSHT does not tolerate alcohol or drugs on campus. In addition, students who have a problem or have knowledge of another student with a drug or alcohol related problems are encouraged to speak confidentially with the School Director. A confidential appointment can be scheduled by calling the Director. Possession or use on campus of any firearm or other dangerous weapon or incendiary device or explosive material, unless such possession or use has been authorized by the Institute, may subject the student to suspension, dismissal, or termination.

16. A Safety Report for this campus is available at the front desk. Copies are available free of charge upon request.

17. Students or graduates seeking to transfer to another institution acknowledge that the transfer/acceptance of credit is the prerogative of each individual post-secondary institution within their own guidelines and policies and RSHT makes no claim in this regard except in those cases where written articulation agreements are in place (see *Catalog*, Transfer Credits).

18. It is important for graduates to keep an accurate address and phone number on file for mailings and job placement services.

19. The Commonwealth of Virginia, Department of Health Professions, Board of Nursing requires licensure of practical nurses in accordance with the Code of Virginia. A Practical Nurse graduate must pass the State Examination in order to become employed and carry the title LPN.

20. Academic Accommodations for students with disabilities are provided on a case-by-case basis. Request for accommodation should be made directly to the Director.

21. I have read and understand the student grievance procedure stated in the school catalog (see *Catalog*, Student Grievance Procedure).

I hereby acknowledge reading the above referenced statements and understand my rights and responsibilities as a student at RSHT Training Center. I also acknowledge that I received a copy of RSHT's *Catalog* and my Enrollment Agreement at the time of my enrollment.

Student Signature _____   Date 5-11-06

Form 207 CHS ha 11/29/05

RSHTWOODEN,L0021

RSHT0002813