# EXHIBIT

# 10

A portion of this document has been redacted pursuant to the Stipulated Protective Order (Docket No. 66) (Aug. 30, 2012), ¶ 6.  An unredacted version has been filed under seal.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

_____

MARY MORGAN, et al.,
on behalf of themselves and
all other similarly situated,
      Plaintiffs,
 vs.           Civil Action No.
                  3:12cv373-JAG

RICHMOND SCHOOL OF HEALTH
AND TECHNOLOGY, INC.,

      Defendant.
_____

DEPOSITION OF ASHLEY THOMAS

September 20, 2012
9:13 a.m.

Taken at:

BRENNER, EVANS & MILLMAN, P.C.
411 East Franklin Street, Suite 200
Richmond, Virginia 23219

REPORTED BY: Lisa M. Blair, RPR
COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Suite D-1
Richmond, Virginia 23233
804.359.1984

Page 2

1  APPEARANCES:
2  Megan Cacace, Esquire
   Stephen F. Hayes, Esquire
3  RELMAN, DANE & COLFAX PLLC
   1225 19th Street NW
4  Suite 600
   Washington DC 20036
5  202-728-1888
   Counsel for the Plaintiffs
6
7  Alexander S. deWitt, Esquire
   BRENNER, EVANS & MILLMAN, P.C.
8  411 East Franklin Street, Suite 200
   Richmond, Virginia 23219-0470
9  804-644-1300
   Counsel for the Defendant

Page 3

           I N D E X

ASHLEY THOMAS           PAGE
  By Mr. deWitt          4, 118
  By Mr. Hayes           114

          E X H I B I T S

| EXHIBITS | | PAGE |
|---|---|---|
| 221 | RSHT0025290 | 50 |
| 222 | RSHT0005176 TO 5178 | 73 |
| 223 | RSHT0005245 TO 5246 | 74 |
| 224 | RSHT0005256 | 86 |
| 225 | RSHT0005174 TO 5175 | 87 |
| 226 | RSHT0005201 | 91 |
| 227 | RSHT0005217 | 93 |
| 228 | RSHT0005224 | 94 |
| 229 | RSHT0005202 | 95 |
| 230 | RSHT0005290 to 5291 | 96 |
| 231 | RSHT0005288 | 97 |
| 232 | RSHT0005232 | 98 |
| 233 | RSHT0005219 to 5220 | 100 |
| 234 | RSHT0005226 to 5227 | 105 |
| 235 | RSHT0005228 to 5231 | 107 |
| 236 | P-000110 to 000111 | 108 |

Page 4

     ASHLEY THOMAS, a Plaintiff, called
by the Defendant, first being duly sworn, testified as
follows:

     EXAMINATION BY MR. DEWITT:

  Q.  Ms. Thomas, good morning.
  A.  Good morning.
  Q.  My name is Alex deWitt. I'm an attorney, and I represent Richmond School of Health and Technology, Inc. in a lawsuit brought by Mary Morgan, yourself, and six other plaintiffs now pending in the United States District Court for the Eastern District of Virginia, Richmond Division. And we're here to take your deposition this morning.
     Will you state your full name, please?
  A.  Ashley Shadae Thomas.
  Q.  And how do you spell your middle name?
  A.  S-H-A-D-A-E.
  Q.  And what's your date of birth?
  A.  [REDACTED]
  Q.  And the last four digits of your Social?
  A.  [REDACTED]
  Q.  Have you given deposition testimony before?

Electronically signed by Lisa Blair (501-025-348-9548)    53b99c1a-d5d2-4015-bd9b-b28259b2949d

Page 65

1   A.   No, sir.
2   Q.   Did you have interaction with customers
3   during any of the other four weeks that you were at
4   Walgreens?
5   A.   When I did overnight, I was able to do
6   more stuff, yes.
7   Q.   Okay. And explain that to me. What
8   other stuff did you do when you were working at night?
9   A.   The pharmacist, she allowed me to take
10  the prescriptions from the patients, enter them into
11  the system --
12  Q.   Okay.
13  A.   -- fill them, put up medications.
14  Q.   And can you just describe for me the
15  process of taking a prescription from a patient?
16      MR. HAYES: Objection; calls for
17  speculation.
18  A.   Basically, when they bring you in their
19  prescription, you just enter into the system the
20  prescription name, the directions.
21  Q.   If a patient had questions regarding
22  medication, could you answer them?
23  A.   No, sir.
24  Q.   You would have to call the pharmacist
25  over?

Page 66

1   A.   Yes, sir.
2   Q.   You mentioned filling a prescription and
3   then putting up the medication. What did you mean by
4   putting up the medication?
5   A.   Like when they order a new shipment,
6   basically it comes in a box, and just put it on the
7   shelves.
8   Q.   So there's -- you mentioned a female
9   pharmacist you were working with at night at
10  Walgreens?
11  A.   Yes, sir.
12  Q.   Did she let you do anything else?
13  A.   That was basically it.
14  Q.   Okay. So during the first week during
15  the day hours there was a different pharmacist that
16  you were working with, correct?
17  A.   Yes, sir.
18  Q.   A male pharmacist?
19  A.   (Indicating in the affirmative).
20  Q.   And he had you filling prescriptions,
21  correct?
22  A.   Uh-huh (affirmative).
23  Q.   And then when you started working at
24  night with the female pharmacist, she had you doing
25  other tasks that --

Page 67

1   A.   That's correct.
2   Q.   -- you just described for us?
3   A.   That's correct.
4   Q.   Did you have any complaints to the female
5   pharmacist?
6       MR. HAYES: Objection; vague.
7   Q.   Or make any complaints to the female
8   pharmacist?
9   A.   No, sir.
10  Q.   Did you work with the female pharmacist
11  during the second week of the internship?
12  A.   It was either the second or third week.
13  Q.   Okay. What about the fourth and fifth
14  week of the internship, who did you work with?
15  A.   The female pharmacist.
16  Q.   So is it fair to say that the majority of
17  your internship was spent with the female pharmacist?
18  A.   That's correct.
19  Q.   And the time that you -- during the
20  entire time that you spent with the female pharmacist,
21  you had no complaints that you made to her --
22      MR. HAYES: Objection, vague.
23  Q.   -- is that correct?
24  A.   That's correct. It might have been
25  almost half with Ken, the male pharmacist.

Page 68

1   Q.   What was the female pharmacist's name?
2   A.   I don't remember.
3   Q.   And when you concluded your externship,
4   is that approximately when you graduated from RSHT?
5   A.   My internship; yes, sir.
6   Q.   Your internship, right. Did you make any
7   complaints to anyone at RSHT about your internship at
8   Walgreens?
9   A.   Oh, yes, sir.
10  Q.   Who did you complain to?
11  A.   Ms. -- is her name Carrington?
12  Q.   Carrington?
13  A.   The school director.
14  Q.   ==What did you say to -- did you meet with==
15  ==the school director?==
16  A.   ==Yes, sir.==
17  Q.   ==When you met with her, what did you tell==
18  ==her?==
19  A.   ==I told her I don't think that it's fair==
20  ==that I have to work eight hours at this Walgreens,==
21  ==don't get paid for it, and basically they have me just==
22  ==filling prescriptions, not teaching me anything.==
23  Q.   ==Okay. So you complained that you were==
24  ==not being paid, correct?==
25  A.   ==I complained that I wasn't being taught==

Page 69

1  anything.
2      Q.   And what was her response?
3      A.   Either I can complete it and graduate, or
4  I can stop and drop out.
5      Q.   And what was it that you thought you
6  should -- Walgreens should be teaching you that it
7  wasn't?
8          MR. HAYES: Objection; vague.
9      A.   The stuff that the pharmacist did like on
10 night shift. In day shift, they only -- they
11 restricted me to one area; get the prescriptions, put
12 them in, that's it. No actions, no nothing. It was
13 like I was just restricted to this one area all day.
14     Q.   That's when you were working with the
15 male pharmacist?
16     A.   Yes, sir.
17     Q.   And you're saying -- I'm trying to
18 understand. But then when you worked with the female
19 pharmacist, she let you do the other things, correct?
20     A.   That is correct.
21     Q.   So then your complaints to the school
22 director were really focused on working with the male
23 pharmacist?
24         MR. HAYES: Objection; misstates testimony.
25     Q.   If I'm understanding what you're saying.

Page 70

1      A.   See, the female pharmacist, they don't
2  allow you to do your intern at night, so she wasn't
3  familiar with how things go. So around my last week,
4  that's when she found out how the stuff that I was
5  doing, they usually don't let them do. So I
6  basically -- basically, she wasn't aware of the things
7  that they allow the students to do and not do.
8      Q.   When you say "they," you're talking about
9  Walgreens?
10     A.   Exactly.
11     Q.   They had their own policy as to what you
12 could and couldn't do?
13     A.   No.
14         MR. HAYES: Objection; misstates testimony.
15     A.   No. RSHT has a policy as to what we can
16 do and cannot do.
17     Q.   All right. Is that -- who told you that?
18         MR. HAYES: Objection.
19     Q.   What's that based on?
20     A.   Carolyn Shelton.
21     Q.   Who is Carolyn Shelton?
22     A.   That was my team lead.
23     Q.   And she told you that basically there
24 were parameters in what you could and could not do
25 based on something RSHT had told her?

Page 71

1          MR. HAYES: Objection; misstates testimony.
2      Q.   I'm trying to understand what she told
3  you.
4      A.   When I told you that I complained to her
5  about why am I being restricted to this, she told me,
6  This is the way we do things. They come in, and you
7  guys fill the prescription. That's it.
8      Q.   Carolyn Shelton, she was a Walgreens
9  employee, correct?
10     A.   That's correct.
11     Q.   And she told you, This is the way we do
12 things?
13     A.   That is correct.
14     Q.   Did she tell you anything else?
15     A.   That the students before me, this is what
16 they did.
17     Q.   Anything else that you recall regarding
18 that conversation?
19     A.   I asked her, Is this all I'm learning?
20 And she said yes.
21     Q.   Was Ms. Shelton your team lead when you
22 worked the night shift with the female pharmacist?
23     A.   It was only me and the female pharmacist.
24     Q.   There's an indication or an allegation in
25 the complaint that we discussed early on that you

Page 72

1  learned about RSHT from a friend; is that accurate?
2      A.   Uh-huh (affirmative). Yes, sir.
3      Q.   Which friend did you -- do you know the
4  friend's name?
5      A.   Tammy Rowe.
6      Q.   Can you spell the last name, please?
7      A.   R-O-W-E.
8      Q.   What did Ms. Rowe tell you?
9      A.   That she was going to school for LPN.
10     Q.   Anything else?
11     A.   That she was almost done. That was it.
12 And it was an easy school.
13     Q.   Would this have been sometime in 2009
14 when you had this conversation?
15     A.   Yes, sir.
16     Q.   Do you know where she was attending RSHT?
17 There's a Chester campus and a Richmond campus,
18 correct?
19     A.   Richmond campus.
20     Q.   When she -- when you spoke to Ms. Rowe,
21 were you interested in going back to school?
22     A.   Yes, sir.
23     Q.   Were you interested in any certain field
24 or vocation at that point?
25     A.   Just the healthcare field.

```
                                            Page 77
 1   it.
 2       Q.  Okay.  So this would -- the document
 3   marked as Exhibit 223, that's an incomplete draft of
 4   your resumé?
 5           MR. HAYES:  Objection; misstates testimony.
 6       Q.  I'm trying to understand what you're
 7   saying.
 8       A.  What I'm saying is the reason like they
 9   got the McDonalds, Burger King, and credit union was
10   because I did submit my resumé for her to, I guess,
11   dress it up.
12       Q.  Okay.
13       A.  And she quit.  And at that time they
14   wasn't able to find someone else to teach that course.
15   So I never completed that.
16       Q.  I see.  So this is a different format of
17   your resumé that you have not seen before?
18       A.  Yes.
19       Q.  Okay.  Thank you.  All right.  After your
20   friend Tammy Rowe told you she was going to school,
21   did she suggest that you contact RSHT?
22       A.  Yes, sir.
23       Q.  And did you?
24       A.  Yes, sir.
25       Q.  How did you get their phone number?
```

```
                                            Page 78
 1       A.  Google.
 2       Q.  And when you -- do you recall that --
 3   when you called, did someone answer the phone when you
 4   called the number that you Googled for RSHT?
 5           MR. HAYES:  Objection; assumes facts not in
 6   evidence.
 7       A.  Yes, sir.
 8       Q.  Okay.  Do you remember who you spoke to?
 9       A.  I think it was the receptionist.
10       Q.  And do you remember that conversation?
11       A.  No.  She just basically was like I had to
12   speak to an adviser, school adviser.
13       Q.  Did you speak to a school adviser on the
14   phone?
15       A.  I had a meeting.
16       Q.  And you scheduled that meeting when you
17   talked to the receptionist on the phone?
18       A.  That's correct.
19       Q.  All right.  And do you know whether the
20   meeting you scheduled was in March 2009?
21       A.  I don't recall the dates.
22       Q.  All right.  Do you recall that meeting
23   with the school adviser?
24       A.  Yes, sir.
25       Q.  Which campus did you go to for the
```

```
                                            Page 79
 1   meeting?
 2       A.  Chester.
 3       Q.  When you arrived at the Chester campus,
 4   do you recall who you first met with, the first person
 5   you spoke to when you arrived at the campus?
 6       A.  The receptionist.
 7       Q.  Did you have a conversation with the
 8   receptionist?
 9       A.  No.  Just hi.
10       Q.  And after you said hi, what's your next
11   memory?
12       A.  She just was like, Can I help you?  I was
13   like, I'm here to see Amy Wright.
14       Q.  Did she get Amy Wright for you?
15       A.  Yes.
16       Q.  And then what happened next?
17       A.  That's when I went into her office, and
18   we had the interview.
19       Q.  And can you recall the interview with Amy
20   Wright?
21       A.  She basically asked me about myself,
22   asked me did I have any children.  And then basically
23   she asked me, like, what do I want to do with myself?
24   Do I want to go to school?  If so, what would be a
25   reason that would hold me back from going to school
```

```
                                            Page 80
 1   and completing it.  And then after all that, she was
 2   like, Well, let me tell you about the school.
 3       Q.  Okay.
 4       A.  She told me about the school.
 5       Q.  Do you remember anything else about that
 6   interview?
 7       A.  That was, you know, a summary of
 8   basically what happened.
 9       Q.  Okay.  Did you discuss a specific program
10   at RSHT with Ms. Wright?
11       A.  Pharmacy tech.
12       Q.  Is that what you were interested in when
13   you met with her?
14       A.  Yes, sir.
15       Q.  Had you had an interest in pharmacy tech
16   before you went and met with Ms. Wright?
17       A.  Yes, sir.
18       Q.  How long had you had that interest?
19       A.  I've always liked, you know, biology.  So
20   when Tammy was telling me about it, it caught my
21   attention.  So I was telling Amy about that.
22       Q.  Okay.  Had you looked at any other
23   schools?
24           MR. HAYES:  Objection; vague.
25       Q.  Considered any other schools in the area
```

Page 81

1   with respect to pharmacy technology?
2       A.   No, sir.
3       Q.   All right.  And did Ms. Wright describe
4   the pharmacy tech program to you?
5            MR. HAYES:  Objection; vague.
6       A.   What do you mean, did she describe it?
7       Q.   I'm trying to find out from you what you
8   remember about this interview with Ms. Wright, what
9   information she gave you.
10      A.   Basically, she told me the success rate
11  for individuals who go to their school.  She said as
12  far as the success rate for that program, there really
13  wasn't statistics available because the program was
14  new; but basically, she showed me a document saying
15  that, you know, on average that amount was what
16  individuals who graduate end up making.  It was
17  telling me that it was a good school to go to.
18      Q.   She showed you a document?
19      A.   Uh-huh (affirmative).
20      Q.   And the average amount that students end
21  up making, is that what you just said?
22      A.   Yes, sir.
23      Q.   What was on the document; do you recall?
24      A.   It was like 60,000.
25      Q.   And was this an RSHT document; do you

Page 82

1   recall?
2            MR. HAYES:  Objection; calls for
3   speculation.
4       Q.   Do you know where the document came from?
5       A.   I mean, she pulled it out of her files.
6       Q.   Okay.  The average amount of students,
7   was she referring to students in Virginia, or students
8   nationwide, or did you-all have that type of
9   conversation?
10           MR. HAYES:  Objection; calls for
11  speculation.
12      A.   She didn't specify.
13      Q.   Did she specify the types of jobs that
14  these students were working at?
15      A.   What was the last question you just asked
16  me?
17      Q.   Did she specify the types of jobs that
18  these students were working at?
19      A.   No.  I'm talking about the other
20  question.
21           MR. DEWITT:  Can you read back the prior
22  question.
23           COURT REPORTER:  "The average amount of
24  students, was she referring to students in Virginia,
25  or students nationwide, or did you-all have that type

Page 83

1   of conversation?"
2            MR. HAYES:  I'll put in the same objection,
3   but you can answer.
4       A.   Okay.  As far as that question you asked,
5   she was referring to students that went to that
6   school.  She didn't specify if it was -- if they had
7   different schools in other states, but she was
8   referring to RSHT.
9       Q.   Did she give you a copy of that document?
10      A.   No.
11      Q.   Did you ask for a copy?
12      A.   No.
13      Q.   All right.  Do you remember anything else
14  about that meeting with Ms. Wright, information that
15  she provided to you?
16      A.   She just was saying that the school was a
17  good school to go to, basically, and was saying that
18  the reason that I gave her of why I wouldn't complete
19  it, she basically was like:  Think of your children.
20  Do this for your kids.  That was the push I needed.
21      Q.   Were you unemployed at that point?
22      A.   I was at McDonalds.
23      Q.   You were working at McDonalds?
24      A.   Uh-huh (affirmative).
25      Q.   What was your position at McDonalds?

Page 84

1       A.   A crew trainer.
2            MR. HAYES:  Alex, we are almost at two
3   hours.
4            MR. DEWITT:  We are?  I'm happy to take a
5   break now.
6            (Whereupon, a recess was taken).
7    BY MR. DEWITT:
8       Q.   Ms. Thomas, before we took a break, we
9   were talking about your meeting with Ms. Wright.  And
10  you had mentioned that she showed you a document with
11  information regarding the average amount made by
12  students; is that correct?
13      A.   That's correct.
14      Q.   Did you and Ms. Wright discuss any
15  specific positions in the greater Richmond area in the
16  area of pharmacy technology that paid $60,000?
17           MR. HAYES:  Objection; vague.
18      A.   No, sir.
19      Q.   Did you do -- after talking to
20  Ms. Wright, did you do any type -- did you make any
21  independent inquiry regarding salaries for pharmacy
22  technicians in the greater Richmond area?
23           MR. HAYES:  Objection; vague.
24      A.   Are you asking did I research what she
25  told me?

Electronically signed by Lisa Blair (501-025-348-9548)                                    53b99c1a-d5d2-4015-bd9b-b28259b2949d

Page 85

```
 1      Q.   Yes, sir.
 2      A.   No.
 3      Q.   Yes, ma'am.  Excuse me.
 4           Okay.  So you met with Ms. Wright.  She
 5  told you about the pharmacy technology program.  Did
 6  you have any specific questions for her during that
 7  meeting?
 8         MR. HAYES:  Objection; vague.
 9      A.   Did I ask her any questions?
10      Q.   Yes.
11      A.   No.
12      Q.   And after that meeting, did you do
13  anything else at RSHT that day?
14      A.   No.
15      Q.   Had you decided that day whether you were
16  going to enroll at RSHT?
17      A.   I don't remember.
18      Q.   Okay.  After your meeting with
19  Ms. Wright, when was your next contact with anyone at
20  RSHT?
21      A.   I remember she called me and asked me was
22  I going to enroll.
23      Q.   And what was your response?
24      A.   Her exact words wasn't was I going to
25  enroll.  She just was like, I need to think about the
```

Page 86

```
 1  kids.  And she was like, you know, better myself.  I
 2  was like, okay, I'm going to go through with it.
 3      Q.   You referred to kids plural.  How many
 4  children do you have?
 5      A.   Two.
 6      Q.   So did you schedule an appointment to go
 7  back into RSHT?
 8      A.   Yes, sir.
 9      Q.   And did you meet with Ms. Wright during
10  the second meeting?
11      A.   Yes, sir.  I think it was, like, later
12  that day I met back with her after she called.
13           (Exhibit Number 224 was marked for
14  identification).
15      Q.   I'll show you Exhibit 224.
16      A.   (Witness reviewing document).
17      Q.   Is this your application for admission to
18  RSHT?
19      A.   I don't remember completing the
20  application.
21      Q.   Does this document bear your signature
22  and date at the bottom?
23      A.   I don't remember the document.  So I
24  don't recall signing this.
25      Q.   Do you recognize your signature?
```

Page 87

```
 1      A.   Does it look like my signature?
 2      Q.   Yes, ma'am.
 3      A.   It looks like it.
 4      Q.   Does this look like your handwriting on
 5  the document?
 6      A.   Yes, it looks like my handwriting.
 7      Q.   You just don't remember filling this
 8  document in?
 9      A.   I don't remember ever filling out an
10  application.
11      Q.   Okay.
12      A.   That's what I'm saying.
13           (Exhibit Number 225 was marked for
14  identification).
15      Q.   Do you recognize this document?
16      A.   Yes.
17      Q.   Exhibit 225, is this your enrollment
18  agreement with RSHT?
19      A.   Yes, sir.
20      Q.   And does this document bear your
21  signature and date at the bottom beside "student
22  signature?"
23      A.   Yes, sir.
24      Q.   And does the second side of -- second
25  page of the document bear your initials down the
```

Page 88

```
 1  right-hand side?
 2      A.   I remember this part, the first part, not
 3  the second part.
 4      Q.   You don't remember the second page?
 5      A.   No, sir.
 6      Q.   Do you recognize your initials on the
 7  second page?
 8      A.   When you're asking me do I recognize my
 9  initials, are you asking me in a different way did I
10  sign this?  I'm not sure.
11      Q.   Did you sign this?
12      A.   I don't remember this document, so I
13  don't remember signing it.
14      Q.   Do these appear to be your initials on
15  the second page of the document?
16      A.   I don't remember this documentation at
17  all, so I don't remember signing it.  So for me to say
18  yes, this could be my signature, I'd be lying, because
19  I don't remember this document at all.
20      Q.   Are you familiar with your own
21  handwriting?
22      A.   Uh-huh (affirmative).
23      Q.   Okay.  And based on your familiarity with
24  your own handwriting, I'm asking you if the initials
25  on the second page appear to be your initials?
```

Page 89

```
 1      A.   The way I would write my initials, yes.
 2      Q.   Okay.  Thank you.  Were you with -- on
 3  March 16, 2009, I think you testified you went back to
 4  RSHT and met with Ms. Wright; is that correct?
 5           MR. HAYES:  Misstates prior testimony.
 6      Q.   Is that what you told me?
 7      A.   I didn't say a specific date, but I said
 8  that day I had a meeting with her.
 9      Q.   The day that you had the meeting with
10  her, you went back and saw her a second time?
11      A.   That's correct.
12      Q.   When you went back and saw her a second
13  time, did you fill in and sign paperwork?
14      A.   Did I sign paperwork?  Yes.
15      Q.   Okay.  And did you ask Ms. Wright any
16  questions about the paperwork you were signing?
17      A.   A lot of the paperwork was like this.
18  She already filled it out, and I just had to sign it.
19      Q.   Do you know how to read?
20      A.   Of course I know how to read.
21      Q.   Okay.  When you signed the documents, did
22  you ask Ms. Wright any questions about the documents
23  you were signing?
24      A.   She was explaining the documents as we
25  went along.
```

Page 90

```
 1      Q.   Did she prevent you from reading the
 2  documents?
 3      A.   No; but it was more of a rushed type
 4  deal.
 5      Q.   Okay.  But did she prevent you from
 6  reading anything that she showed you?
 7           MR. HAYES:  Objection; asked and answered.
 8  You can answer again, if you want.
 9      A.   I mean, yes, she -- I came in for the
10  second time, and she saw me right then.  And she was,
11  like, handing me the documents and was like -- she had
12  a list of stuff.  She was like, Okay.  This is what
13  you need to fill out to begin your enrollment.  Okay.
14  So she put the first document.  Okay.  This is what
15  you need to sign.  And it was like that.  And she gave
16  me like some other stuff, and was like basically you
17  can read over it if you want, but basically what I'm
18  telling you is everything that's on the documents.
19  So --
20      Q.   And did you have any questions for her as
21  you went through the paperwork?
22      A.   She told me if I have any questions I can
23  come back and see her any time.
24      Q.   Did you?
25      A.   When I signed, I didn't have any
```

Page 91

```
 1  questions.
 2      Q.   Did you have any questions after that
 3  meeting?
 4      A.   Oh, yes.  Oh, yes.
 5      Q.   What questions did you have for her after
 6  that meeting?
 7           MR. HAYES:  Objection; vague.
 8      A.   My first question was, like, I was not
 9  told that I had to pay a monthly fee to attend the
10  school.  I was asking her why don't we have a steady
11  teacher.  I was asking her, like, some of the material
12  that we was learning -- like biology, for instance,
13  asking her why does that relate to pharmacy tech.
14      Q.   You asked Ms. Wright how biology relates
15  to pharmacy tech?
16      A.   Uh-huh (affirmative).
17      Q.   Do you recall what her response was?
18      A.   No.
19      Q.   And when you asked Ms. Wright about the
20  $40 fee, do you recall what her response was?
21      A.   That we have to pay to keep the lights
22  on.
23           (Exhibit Number 226 was marked for
24  identification).
25      Q.   I'm going to show you document marked
```

Page 92

```
 1  Exhibit 226.
 2      A.   (Witness reviewing document).
 3      Q.   Do you recognize this document?
 4      A.   I remember seeing something that was
 5  similar to this, but it wasn't broke into categories
 6  the way it is now.
 7      Q.   Do you recall seeing this document?
 8      A.   Nope.
 9      Q.   Is that your signature towards the bottom
10  beside "student signature?"
11      A.   It doesn't look like it.
12      Q.   Do you recall signing the document?
13      A.   Do I recall signing this document that I
14  just said that I don't remember?
15      Q.   Okay.  You don't remember.  Do you
16  remember meeting with somebody named Stephanie Shant?
17      A.   Uh-huh (affirmative).
18      Q.   Was she the financial aid officer?
19      A.   Yes.
20      Q.   Did you meet -- do you recall what day
21  you met with her?
22      A.   With Stephanie?  Stephanie came towards
23  the end.  So any documents that was signed in the
24  beginning for tuition, that was a whole different
25  adviser.  She was not present when I started.
```

23 (Pages 89 to 92)

Page 113

1   A.   I don't know.
2   Q.   To the extent you know?
3   A.   I don't know.
4   Q.   Do you understand the current complaint that's filed is called a second amended class action complaint? Do you understand what a class action is?
7        MR. HAYES: Objection; asks for a legal conclusion. You can answer, if you know.
9   A.   No, sir.
10  Q.   If the court were to certify a class, do you have any understanding of what your responsibilities would be to the class?
13       MR. HAYES: Objection; asks for a legal conclusion. You can answer, if you know.
15  Q.   Do you have any understanding?
16  A.   What do you mean?
17  Q.   Do you have any understanding of what your responsibilities as a plaintiff in this lawsuit would be to the proposed class?
20       MR. HAYES: Objection; asks for a legal conclusion.
22  A.   No, sir.
23       MR. DEWITT: Can we take like a one-minute break? I'm just going to go through my notes quickly. I think we're close to the end here.

Page 114

1        (Whereupon, a recess was taken).
2        MR. DEWITT: Thank you, Ms. Thomas. That's all the questions I have, subject to any questions your counsel may have.
6        EXAMINATION BY MR. HAYES:
8   Q.   So I will ask a few follow-up questions. When you were thinking about enrolling at RSHT and meeting with RSHT officials -- you testified about that earlier -- did they make representations to you about the quality of the education that you would receive?
14  A.   Yes.
15  Q.   Did you rely on those representations in enrolling at RSHT?
17  A.   Yes.
18       MR. DEWITT: Objection to the extent that calls for a conclusion.
20  Q.   When you were meeting with those RSHT officials, did they make representations to you that RSHT would prepare you for the certification exam?
23  A.   Yes.
24  Q.   Did you rely on that representation?
25       MR. DEWITT: Same objection.

Page 115

1   A.   Yes, sir.
2   Q.   When you met with RSHT officials and went over documents about financial aid, did they make representations to you about what those documents meant?
6        MR. DEWITT: I'm going to object to the extent she's already testified regarding lack of memory, and also to legal conclusion. Subject to that, you can answer.
10  Q.   When you were meeting with RSHT officials, you testified earlier that you did go over certain documents with them?
13  A.   Yes.
14  Q.   Did they make representations to you about what those documents meant?
16  A.   Yes.
17  Q.   Did you rely on those representations?
18  A.   Yes.
19       MR. DEWITT: Same objection regarding legal conclusion.
21  Q.   When you met with RSHT officials to go over financial aid, did they make representations to you that you would be getting grants, and not loans?
24  A.   Yes.
25  Q.   Did you understand that you were taking

Page 116

1   out grants, and not loans? Did you understand it to be the case that you were taking out grants, and not loans?
4   A.   Yes.
5   Q.   After you graduated from RSHT, you testified that you didn't take the certification exam immediately?
8   A.   (Indicating in the affirmative).
9   Q.   Did you not take the certification exam because you believed RSHT didn't prepare you to pass that certification exam?
12  A.   Yes.
13  Q.   You testified earlier that after you took the certification exam and didn't pass it, you eventually decided not to retake the certification exam. Did you decide not to retake it because you felt that RSHT had not prepared you?
18  A.   Yes.
19  Q.   You testified earlier about leaving Omnicare. Did you understand that you would have had to have left Omnicare after a certain amount of time because you had not been certified?
23  A.   Yes.
24  Q.   Do you know what that time period was?
25       MR. DEWITT: I'm just going to object. That

29 (Pages 113 to 116)

# THOMAS DEPOSITION

# EXHIBIT 224



**RSHT**
751 West Hundred Road, RT 10
Chester, VA 23836
(804) 751-9191 FAX (804) 751-2599

| OFFICE USE ONLY |
|---|
| Start Date_____ |
| Adm Code_____ |

### Application for Admission

I hereby apply for enrollment in accordance with the terms and regulations of RSHT. I acknowledge that I am responsible for an application fee of **$75.00** for all programs. I understand that this fee is non-refundable.

Name _Ashley Thomas_



REDACTED

☐ Surgic_____  ☐ _____iology

Applicant's Signature: _Ashley Thomas_

Date: 3/16/09

Form 102    Revised ha 11-14-06

Ex. 224

**RSHTTHOMAS,A0087**          **RSHT0005256**

# THOMAS DEPOSITION

# EXHIBIT 225

# RSHT
## ENROLLMENT AGREEMENT

☐ Main Campus:
1601 Willow Lawn Drive, Suite 320
Richmond, VA 23230

☑ Branch Campus:
751 West Hundred Road
Chester, VA 23836

Name: **Ashley S Thomas**
    First    MI    Last

SSN: [redacted]

Address: [redacted]

Birth date: [redacted]

City: **Colonial Heights**   State: **VA**   Zip Code: **23834**

Telephone: [redacted]   Email: [redacted]

As the above-named applicant, I hereby agree to be enrolled in the **Pharmacy Technology Diploma** program which is **40** weeks of instructional time. Classes are scheduled to begin on **03/23/09** and end on **11/26/2009** **1/7/2010**. Classes meet **Mon-Thursday** from **8:00 Am** to **5:00 pm**.

Total tuition of $ **10,098⁰⁰**, a non-refundable application fee of $ **75⁰⁰**. Should I have to repeat a course, I will be charged a *per credit hour* fee of $ **306⁰⁰**. I hereby acknowledge payment of a deposit of $ **75⁰⁰**, leaving a balance due to the institution of $ **10,098⁰⁰**.

I hereby agree to all provisions of this Enrollment Agreement, and understand that I have agreed to accept a place in the class described above and agree to pay to RSHT all fees according to the terms and conditions contained herein. Furthermore, I acknowledge that I have read, fully understand, and received a copy of this agreement.

I understand that this agreement becomes a legally binding instrument upon the school's written acceptance of my application, unless cancelled by me pursuant to the refund policy contained within this agreement.

Student Signature: *Ashley Thomas*   Date: **3-16-09**

Grantor's Signature: [signature]   Date: **3/16/09**

Note: Please read and initial the statements on the back of this sheet.

RSHT is certified to operate in Virginia by the State Council of Higher Education for Virginia

Form # 105 ha   Revised 12/18/06

Ex. 225

RSHTTHOMAS,A0005

RSHT0005174

**Attendance:**

Attendance is required at all scheduled classes. If in an emergency an absence becomes necessary, the student must notify the school prior to the beginning of the schedule class. Students with seven consecutive absences or total absences exceeding 25% of their scheduled classes will be withdrawn from the program. Refer to the School Catalog and Student Handbook for further details.

Initials _____

**Cancellation and Refund Policy:**

If an applicant cancels this agreement no later than the third business day after the date of this agreement, a full refund will be made minus the non-refundable application fee. The application fee for all programs is $75.00. If a class is cancelled by the school, all monies will be refunded.

All students will be charged a non-refundable application fee in addition to the tuition charges as specified below. The portion of the program completed will be determined by the number of weeks attended. Any portion of a week's attendance will be considered a full week for the purpose of the refund calculation.

1. If a student does not begin classes, no more than $100.00 of the tuition paid will be retained by the school.
2. A student who enters school but withdraws prior to completing the first 25% of the period charged will be assessed 50% of the tuition charges for the period.
3. A student, who withdraws after completing the first 25%, but prior to completing 50% of the period charged, will be assessed 75% of the tuition charges for the period.
4. A student who withdraws after completing half, or more than half, of the period charged is assessed 100% of the tuition charges for the period.

Refunds are made within 30 days of the cancellation date or date of withdrawal.

Initials _____

**Standards:**

Students are required to abide by the proper standards for dress and conduct while in attendance at all classes and externship training. Profanity, disorderly conduct, or other action which, in the opinion of the school is disruptive, will not be tolerated and will be grounds for dismissal form the program.

Initials _____

**Placement:**

Each graduate may avail him or herself of the school's job placement assistance program. RSHT DOES NOT GUARANTEE EMPLOYMENT. However, every effort will be made to assist the graduate in obtaining employment. There is no charge for this service.

Initials _____

RSHT reserves the right to make changes to the program start date, content, schedule, and/or training hours as deemed necessary.

Initials _____

**Conditions of Agreement:**

This constitutes the entire agreement between the applicant and the school, and no other promise or agreement, expressed or implied, has been made either orally or in writing. Should the student fail to meet the terms of his/her financial obligations contained in this agreement, the school reserves the right to add to this agreement a reasonable amount for collection costs incurred including, but not limited to, collection agency fees, attorney fees of 33.3%, court costs, etc.

Initials _____

Form # 105 ha Revised 12/18/06
RSHT is certified to operate in Virginia by the State Council of Higher Education for Virginia

RSHTTHOMAS,A0006     RSHT0005175

# THOMAS DEPOSITION

# EXHIBIT 226

## Tuition Worksheet

Student Name: Ashley Thomas  Social Security Number: ▮▮▮▮
Program: Pharm Tech  Start Date: 3/23/2009



Student Signature: _Ashley Thim_
Date: 3-16-09
Financing Department Signature: _Stefanie Shank_
Date: 3/16/2009

Ex. 226

Form 416 ha 6/1/06

RSHTTHOMAS,A0032                                      RSHT0005201

# THOMAS DEPOSITION

# EXHIBIT 230

NAME (Print) Ashley Thomas   PROGRAM/START DATE 3-23-09

## RSHT -CHESTER- ENROLLMENT CERTIFICATION

Please read each of the following statements and initial in the space provided to the right of each statement. Please do not hesitate to ask questions.

1. Students are required to maintain satisfactory academic progress in accordance with the Academic Information in the *Catalog*. I understand that homework/outside class preparation is required.   /ST/

2. Financial Aid is available to eligible students upon completion, submission, and processing of a financial aid application. Please note that, in most cases, student financial aid awards include loans. Be sure you know your rights and responsibilities (see *Catalog*, Financial Aid information).   /ST/

3. Tuition payments are to be made as scheduled. Tuition charges for early withdrawal are calculated in accordance with RSHT's refund policy (see *Catalog*, Enrollment Agreement – Cancellation and Refund Policy).   /ST/

4. The criteria for graduation is outlined in the Catalog and includes high school/GED completion documentation, attendance, financial, and meeting academic progress requirements (See *Catalog*, Requirements for Graduation). Graduates seeking job placement assistance must qualify for such assistance as outlined in the Catalog (see Job Placement Assistance). Graduate surveys demonstrate that an average of 75% of students who graduated between December 1, 2007 and November 30, 2008 are employed in training-related positions.   /ST/

5. The graduation rate for students scheduled to graduate and seeking a degree or diploma between December 1, 2007 and November 30, 2008 was 63.44%. Students should make every effort to regularly attend class, complete make-up work when absent, and actively seek advice should problems arise that may adversely affect program completion (see *Catalog*, Makeup/Incomplete and Counseling Services).   /ST/

6. Graduate salaries vary and are affected by job location, graduate experience, and class standing. In a survey of graduates available for placement, who graduated between December 1, 2007 and November 30, 2008, the approximate average entry-level starting salaries for individuals without prior experience in these training areas were:

| Program Area | Entry-Level Wages |
|---|---|
| Practical Nursing (Richmond Campus only) | $33,067.00 per year |
| Medical Assistant (Richmond & Chester Campuses) | $21,323.00 per year |
| Pharmacy Technician | N/A |
| Medical Billing and Coding (Chester only) | $20,082.00 per year |
| Surgical Technology (Richmond & Chester Campuses) | $31,595.00 per year |

/ST/

7. Students are to park ONLY in designated areas. Receipt of student parking instructions is acknowledged. Violators of RSHT's parking policy are subject to probation, suspension, or dismissal.   /ST/

8. I understand that Clinical and Externship hours are scheduled according to site requirements, which may not coincide with my class schedule.   /ST/

9. Any class failed by a student must be repeated. A class may not be repeated more than once without approval of the Director. There is a charge per credit hour for all repeats.   /ST/

10. Students who withdraw and subsequently re-enter are subjected to policies in effect at the time of their re-entry.   /ST/

Ex. 230

RSHT is certified to operate in Virginia by the State Council of Higher Education for Virginia

Form 207 revised ct 12/31/08

11. All students must complete their program within 150% of the normal time frame.

12. A student's enrollment will be terminated for excessive absences which result in unsatisfactory academic progress in a class or if such absences are determined to be without sufficient reason. State regulations require any student who misses seven (7) consecutive days to be withdrawn from the program. Students with excessive absences may have their records reviewed by the School Director (see *Catalog*, Attendance/Appeal).

13. RSHT reserves the right to terminate a student's enrollment on the following grounds: nonconformity with RSHT policy and regulations including parking; unsatisfactory progress; unsatisfactory attendance; nonpayment of tuition; security violations; possession or use on campus on campus of any drugs or alcohol; conduct damaging to facilities; or disruption of academic processes (see *Catalog*, Dismissal from School).

14. The honor System at RSHT is bases on individual integrity. This system assumes that every student will accept his or her role in the academic community with a feeling of self respect and duty. I pledge to support the Honor System or RSHT. I will neither give nor receive aid on any assignment. I will report any violations of this honor code to an instructor or director. **I certify that I have read the Honor Code and that I will abide by its intent.**

15. RSHT does not tolerate alcohol or drugs on campus. In addition, students who have a problem or have knowledge of another student with a drug or alcohol related problems are encouraged to speak confidentially with the School Director. A confidential appointment can be scheduled by calling the Director. Possession or use on campus of any firearm or other dangerous weapon or incendiary device or explosive material, unless such possession or use has been authorized by the Institute, may subject the student to suspension, dismissal, or termination.

16. A Safety Report for this campus is available at the front desk. Copies are available free of charge upon request.

17. Students or graduates seeking to transfer to another institution acknowledge that the transfer/acceptance of credit is the prerogative of each individual post-secondary institution within their own guidelines and policies and RSHT makes no claim in this regard except in those cases where written articulation agreements are in place (see *Catalog*, Transfer Credits).

18. It is important for graduates to keep an accurate address and phone number on file for mailings and job placement services.

19. The Commonwealth of Virginia, Department of Health Professions, Board of Nursing requires licensure of practical nurses in accordance with the Code of Virginia. A Practical Nurse graduate must pass the State Examination in order to become employed and carry the title LPN.

20. Academic Accommodations for students with disabilities are provided on a case-by-case basis. Request for accommodation should be made directly to the Director.

21. I have read and understand the student grievance procedure stated in the school catalog (see *Catalog*, Student Grievance Procedure).

I hereby acknowledge reading the above referenced statements and understand my rights and responsibilities as a student at RSHT. I also acknowledge that I received a copy of RSHT's *Catalog* and my Enrollment Agreement at the time of my enrollment.

Student Signature _____  Date 3-18-09

Form 207 revised ct 12/31/08

RSHT is certified to operate in Virginia by the State Council of Higher Education for Virginia